CONSOLIDATED GAS AND EQUIPMENT COMPANY OF AMERICA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77627.    Filed January 31, 1961.

*L. Karlton Mosteller, Esq., James D. Fellers, Esq.,* and *Edward G. Sievers, Esq.,* for the petitioner.

*John P. Higgins, Esq.,* for the respondent.

WITHEY, *Judge:* Deficiencies have been determined by respondent in the income tax of petitioner for the taxable years and in the respective amounts which follow:

| *Year ended May 31—* | *Deficiency* |
| --- | --- |
| 1954 | $106,519.46 |
| 1955 | 39,533.34 |
| 1956 | 277,841.20 |

The only issue for decision is whether the gain arising from the sale by petitioner of certain of its business properties during its taxable year ended May 31, 1956, was taxable to the petitioner for that year. The parties have agreed that other issues relating to net operating losses available for net operating loss carryback and carry-forward purposes for the fiscal years ended May 31, 1956, through May 31, 1959, will be disposed of by our determination of the foregoing issue. The petitioner has waived by stipulation the other issues presented by the pleadings.

FINDINGS OF FACT.

Stipulated facts are found as stipulated.

The petitioner, Consolidated Gas and Equipment Company of America, is a corporation organized and existing under the laws of Delaware. It kept its books on an accrual method of accounting and reported its income on the basis of a fiscal year ending May 31. Its Federal income tax returns for its fiscal years ended May 31, 1954 to 1959, inclusive, were filed with the district director of internal revenue, Dallas, Texas.

On August 22, 1955, the petitioner and four other corporations, namely, Farm Gas and Equipment Company, Probak Gas and Equipment Company, Valley Gas and Equipment Company, and Modern Appliance Company, all of which were Delaware corporations and subsidiaries of the petitioner, granted Phillips Petroleum Company, also a Delaware corporation, an option to purchase certain properties owned by them.

Subsequently Phillips exercised the option and it, as purchaser, and the petitioner and the above-mentioned four other corporations, as sellers, entered into an agreement of sale under date of October 21, 1955, wherein the sellers contracted to sell to purchaser certain real and personal properties, as described in 93 schedules attached to and made a part of the agreement of sale, for the lump-sum consideration of $2 million which was not allocated as between sellers or as between the real and personal properties contracted to be sold.

The agreement provided as follows:

The sellers warranted the titles to the properties involved and convenanted not to compete with the purchaser in the liquefied petroleum gas business in areas in which the sellers had previously operated for a period of 5 years from the closing date of the agreement, without the prior written consent of the purchaser. The sellers agreed that upon the closing of the agreement and from time to time on demand of the purchaser they would execute and deliver proper

deeds and conveyances and agreed to pay all real and personal property taxes to and including the closing date with all ad valorem taxes on real and personal property to be prorated as of the closing date. The purchaser agreed to accept the personal property in its then condition and its then location but assumed no liabilities of the sellers except those specifically covered by the agreement. The purchaser accepted all existing lease agreements then held by the sellers upon their various bulk plant locations and agreed to perform them according to their terms holding the sellers harmless thereunder from and after the closing date of the agreement. The sellers transferred to the purchaser the sole, exclusive, and perpetual rights to the use of the trade names, Farm Gas and Equipment Company, Probak Gas and Equipment Company, Valley Gas and Equipment Company, and Modern Appliance Company, and agreed within 60 days from the closing date of the agreement to make such changes in their corporate names as would be necessary to the enjoyment by the purchaser of the foregoing trade names. The agreement was not assignable without permission of the sellers, except to a subsidiary of the purchaser.

The agreement contained the following provisions respecting the consideration to be paid by the purchaser and the closing date of the agreement:

4. *Consideration.* PURCHASER agrees to pay SELLERS the sum of Two Million ($2,000,000.00) Dollars as consideration for the sale to it of said real and personal property. At the time of closing One Million Seven Hundred Fifty Thousand ($1,750,000.00) Dollars shall be paid to SELLERS and Two Hundred Fifty Thousand ($250,000.00) Dollars shall be deposited in an escrow account with The First National Bank of Dallas, Dallas, Texas. Such escrow deposit shall guarantee the correction by SELLERS of any defects in the title to real property which an examination of such abstracts shall reveal. The maximum amount to be retained to cover adjustments for shortages or title defect in personal property shall be the sum of Fifty Thousand ($50,000.00) Dollars. The entire escrow deposit shall be retained by the Escrow Agent for not less than sixty (60) days following closing and shall thereafter be paid to SELLERS, provided that in the event there remain titles to real property which are not yet approved, the Escrow Agent shall retain an amount equal to two-thirds of the value of such property or properties according to the schedule attached to the Option [1] granted PURCHASER on August 22, 1955, and the specified maximum in the event that there remain titles to personal property not yet approved or unsatisfied shortages in personal property. In the event SELLERS are unable to satisfy all real and personal property title defects and shortages within 1 year from closing, an amount equal to two-thirds of the value of such item or items according to the schedule attached to the Option granted PURCHASER on August 22, 1955, shall be returned by the

---

[1] The option referred to has not been offered or received in evidence. The values of the properties there scheduled have not been disclosed to the Court.

Escrow Agent to PURCHASER as liquidated damages for the failure of SELL-ERS to fully perform the conditions and warranties of this Agreement in respect to such item or items and the balance of the Escrow Deposit, if any, shall be paid to SELLERS. If the escrow account is not sufficient to cover such liquidated damages, SELLERS shall pay to PURCHASER such additional amount as may be required. Upon receipt of such liquidated damages, PURCHASER will reconvey such property by a quitclaim deed or deeds in the case of real property and bills of sale, without warranty, of personal property. Such escrow deposit will be paid by the Escrow Agent to SELLERS upon the satisfaction of such title requirements. Any fees charged by the Escrow Agent shall be borne by SELLERS.

5. *Closing.* The sale contemplated by this Agreement shall be closed and the PURCHASER shall be entitled to possession [2] of the above described real and personal property effective as of the close of business November 30, 1955. Until such time, risk of loss shall remain upon the SELLERS and the SELLERS shall continue their present insurance policies upon such property in effect and methods of business operation until such date. At the time of closing, SELLERS will furnish good and sufficient warranty deeds upon each tract of real property and the improvements thereon and Title Certificates upon each vehicle hereby sold. Within fifteen (15) days after closing, SELLERS will deliver to PUR-CHASER an abstract upon each tract of real property to be conveyed hereunder, duly certified to the time of closing. PURCHASER will advise SELLERS of any questions of merchantability of the real and personal property within sixty (60) days after the date of delivery of abstracts provided that the expiration of such period will not adversely affect the warranties of title under the provisions of this Agreement. All questions of merchantability of SELLERS' title shall be determined in accordance with the title standards of the bar association of the state in which such real property is located, if such standards have been adopted.

On November 25, 1955, Phillips paid to the sellers, the petitioner and the four other corporations which were parties to the agreement of October 21, 1955 (either directly or indirectly), $1,750,000 and paid to the escrow agent $250,000.[3]

On November 30, 1955, pursuant to the agreement of sale, possession of the properties involved in the agreement was turned over to the purchaser, Phillips, and after that time the sellers did not operate the properties, received no income from the operation of the properties, and incurred no expense from the operation thereof.

Payments by petitioner on account of adjustments involving its properties were made as follows:

---

[2] The purchaser, Phillips Petroleum Company, desired to obtain possession on the closing date in order immediately to begin its operation of the bulk plants involved in the transaction.

[3] The record does not show the portion of the $1,750,000 that was paid to, or properly allocable to, petitioner with respect to its properties or the portion that was paid to, or properly allocable to, the other four corporations with respect to their properties. Nor does the record show the portion of the $250,000 that was paid with respect to, or was properly allocable to, properties of the petitioner or the portion that was paid with respect to, or was properly allocable to, properties of the other four corporations.

June 21, 1956: To Phillips to cover refund of net purchase price of liquid propane gas delivery units #11 and #17 on which title satisfactory to Phillips could not be delivered_____ $4, 615. 13

June 21, 1956: To Phillips to cover cost of repairs to radiator of transport tractor unit #50_____ 111. 00

June 21, 1956: To Phillips to cover refund for furniture, fixtures, and equipment which could not be located_____ 841. 00

June 26, 1956: To Parks Hardware & Equipment Company, Woodland Park, Colorado, for assignment of lease on bulk plant located at that place_____ 7, 000. 00

July 6, 1956: To Central Alfalfa Company, Lexington, Nebraska, to cover cancellation of purchase option agreement with dealer at that bulk plant to meet title requirement of Phillips_____ 7, 148. 00

July 13, 1956: To Phillips to cover repurchase of the Cullison, Kansas, bulk plant on which title satisfactory to Phillips could not be delivered_____ 8, 500. 00

July 13, 1956: To Phillips to cover liquidated damages resulting from inability to deliver title on the Cullison, Kansas, bulk plant satisfactory to Phillips_____ 1, 200. 00

July 13, 1956: To Phillips to reimburse it for costs of moving the Ingalls Plant, Ingalls, Kansas, as ordered by the State of Kansas, in connection with highway construction_____ 1, 300. 00

July 13, 1956: To Phillips on account of the sale of the bulk plant at San Luis, Colorado, to the dealer at that place, instead of to Phillips_ 6, 927. 00

Oct. 5, 1956: To Pacific Finance Company to remove lien on real estate at Lamesa, Texas, in order to meet title requirements of Phillips_____ 1, 500. 00

Mar. 6, 1957: To Homer Hill, lessor, Hart, Texas, for his consent to assignment by petitioner to Phillips of lease on property on which the bulk plant at that place was located in order to meet title requirements of Phillips_____ 2, 000. 00

Total_____ 41, 142. 13

The escrow fund of $250,000 was remitted by the escrow agent to the petitioner and the four other corporations as follows: October 6, 1956, $200,000, and March 20, 1957, $50,000.[4]

In its Federal income tax return for the fiscal year ended May 31, 1956, the petitioner reported the sale during that year of land, buildings, furniture, fixtures, automobiles, trucks, trailers, shop equipment, and bulk plants having a total cost of $608,596.16 for $1,709,800 and a gain thereon of $1,101,203.84. Treating the sale as 18.48 percent completed at May 31, 1956, the petitioner reported $203,503.16 of the $1,101,203.84 as long-term capital gain for its fiscal year 1956. Treating the sale as uncompleted to the extent of 81.52 percent at May 31, 1956, the petitioner did not report the remainder of the $1,101,203.84 or $897,700.68 as gain for the fiscal year 1956 but in its balance sheet

---

[4] The record is silent as to the portion of the escrow fund that was paid to petitioner for or on account of its properties or as to the portion that was paid to the four other corporations for or on account of their properties.

at the end of the year, comprising part of its income tax return, showed the $897,700.68 as "Deferred income." In its Federal income tax return for the fiscal year ended May 31, 1957, the petitioner reported long-term capital gain of $880,374.67 with the following explanation: "Balance Net Capital Gain from Sale of Assets to Phillips Petroleum Co.—reported as Deferred Income—5–31–56—taken up as a final completed sale 5–31–57. See prior returns filed." No explanation was given for reporting long-term capital gain of $880,374.67 instead of $897,700.68.

In determining the deficiency involved herein for the petitioner's fiscal year 1956 the respondent increased the long-term capital gain reported for that year from the sale of assets to Phillips by $897,700.68 with the following explanation:

It is determined that in the fiscal year ended May 31, 1956 you sold to Phillips Petroleum Company all your real estate, personal property, and going business involving over 50 distributing stations used in the sale and distribution of liquefied petroleum products and realized on the sale an increased profit of $897,700.68, computed as follows:

| | |
|---|---:|
| Selling price | $1,709,800.00 |
| Cost | 608,596.16 |
| | |
| Correct profit | 1,101,203.84 |
| Profit per return | 203,503.16 |
| | |
| Increase in profit | 897,700.68 |

The sale by petitioner of its properties to Phillips was a closed transaction in the fiscal year ended May 31, 1956.

### OPINION.

In its amended petition the petitioner, which kept its accounts on an accrual basis, assigned as error the respondent's action in determining that the petitioner's long-term capital gain from the sale of its properties to Phillips was $1,101,203.84 and in increasing by $897,700.68 the amount of long-term capital gain reported from the transaction by petitioner in its income tax return for the fiscal year 1956. As alternatives to the foregoing assignment of error, the petitioner assigned the following errors: (1) That the respondent erroneously determined that the transaction was closed and completed within the petitioner's fiscal year 1956 and that any gain or loss therefrom was required to be included in petitioner's income tax return for that fiscal year, and (2) that the respondent erred in failing to determine that the transaction was closed and completed within the petitioner's fiscal year 1957 and that any gain or loss therefrom was required to be included in the petitioner's income tax return for that year. All of the foregoing assignments of error were denied by respondent in his

answer. In his opening statement at the trial, counsel for the petitioner took the position that in substance there was only one issue, namely, whether the gain from the petitioner's transaction with Phillips was to be accounted for in full for the petitioner's fiscal year 1956 or for its fiscal year 1957. A like position was taken by counsel for the respondent in his opening statement. The case was tried, submitted, and briefed by the parties on that basis. In view of the foregoing and since the petitioner has not submitted any evidence directed to the correctness of the respondent's determination that the amount of gain arising from the sale to Phillips was $1,101,203.84, we conclude that petitioner has abandoned the issue relating thereto. In view of the foregoing we have no issue before us as to the portion of the $2 million paid by Phillips that was properly allocable to the properties it acquired from the petitioner, nor do we have any issue as to the basis of such properties to the petitioner. We have only the alternative issues.

Taking the position that all of the factors essential to the computation of the gain resulting from the sale of the properties involved herein were not known or ascertainable at the end of its taxable year ended May 31, 1956, but that all such factors first became ascertainable with a reasonable degree of certainty during the taxable year ended May 31, 1957, the petitioner contends that the gain from sale is properly includible in income for its fiscal year 1957 and not in income for its fiscal year 1956.

In support of its position that all the factors essential to the computation of the gain resulting from the sale were not known or ascertainable at the end of its fiscal year 1956 but became ascertainable with a reasonable degree of certainty during its fiscal year 1957, the petitioner relies on the testimony of Joseph E. Newman, who has been secretary and treasurer and one of the directors of the petitioner since its organization, on copies of certain letters written to Phillips by attorneys for the petitioner during the period September 4, 1956, through March 15, 1957, relative to certain of the properties involved in the sale, on the fact that during the period June 21, 1956, through March 6, 1957, it made the payments totaling $41,142.13 as set out in our findings, and on certain decisions of this and other courts respecting the time when sales of property were closed and the gain therefrom was properly includible in income.

The agreement of sale provided that:

The sale contemplated by this Agreement shall be closed and the PURCHASER shall be entitled to possession of the above described real and personal property effective as of the close of business November 30, 1955. * * *

The agreement of sale also provided that at the time of closing the sellers would furnish Phillips with warranty deeds upon each tract of

real property and the improvements thereon and title certificates upon each vehicle covered by the agreement; that within 15 days after closing the sellers would deliver to Phillips an abstract upon each tract of real property duly certified to the time of closing, and that Phillips would advise the sellers of any questions of merchantability of the sellers' title to the real and personal properties within 60 days after the date of delivery of abstracts and provided that the expiration of the 60-day period would not affect the warranties of title contained in the agreement of sale. The agreement of sale also provided that in the event the sellers were unable to satisfy all real and personal property title defects and shortages within 1 year from closing, an amount equal to two-thirds of the value of such item or items according to the schedule attached to the option granted by sellers to Phillips on August 22, 1955, was to be returned by the escrow agent to Phillips as liquidated damages for the failure of the sellers to fully perform the conditions and warranties of the agreement in respect to such item or items and the balance of the escrow deposit, if any, was to be paid to the sellers. In the event the escrow account was not sufficient to cover such liquidated damages the sellers were to pay Phillips such additional amount as might be required. Upon receipt of liquidated damages Phillips was to reconvey such property by a quitclaim deed or deeds in the case of real property and bills of sale, without warranty, in the case of personal property. The escrow deposit was to be paid by the escrow agent to the sellers upon the satisfaction of title requirements.

Since the parties have stipulated that, on November 30, 1955, pursuant to the agreement of sale, possession of the properties involved in the agreement was turned over to Phillips and that thereafter the sellers did not operate the properties and received no income from and incurred no expense from the operation of the properties, and in the absence of a stipulation to the contrary, we conclude that at the time of closing on November 30, 1955, the sellers delivered to Phillips warranty deeds to real estate and certificates of title to personal property as contemplated by the agreement of sale.

The evidence shows that 25 parcels of petitioner's real estate were covered by the agreement of sale. The letters of its attorneys relied on by the petitioner show that abstracts with respect to 9 of the parcels were not delivered by petitioner to Phillips within the 15-day period following the closing on November 30, 1955, as specified in the agreement, and further that abstracts with respect to 4 of the 9 parcels were not delivered until after May 31, 1956. With the exception of 4 parcels as to which petitioner delivered abstracts to Phillips on May 14, 1956, and Phillips, after September 4, 1956, advised petitioner of its questions as to merchantability of title, Phillips, so far as we

are able to determine, advised petitioner of its questions as to merchantability of title within the 60-day period after receipt of abstracts as provided by the agreement. The evidence shows that during the period January 12, 1956, to February 6, 1956, Phillips advised the petitioner of its questions as to the merchantability of titles to 15 parcels of real estate; that such objections were not turned over by petitioner to its attorneys until May 25, 1956, that petitioner's attorneys on June 1, 1956, held a telephone conference with the attorney who was handling the title matters for Phillips and that during the conference all of Phillips' questions as to 2 of the properties were waived by Phillips' attorney and that that attorney waived by far the greater portion of Phillips' questions as to the other 13 properties.

Newman, the petitioner's secretary and treasurer, testified that in the latter part of May 1956, he met with representatives of Phillips relative to the matter of clearing titles to the real properties involved in the sale and to obtain from Phillips an extension beyond November 30, 1956, for obtaining and submitting "curative matter" as to titles. He stated that Phillips' representatives refused to consider the extension desired, that he did not recall that the representatives of Phillips agreed at the meeting to accept any titles, and that so far as he knew Phillips, to the time of the meeting, had not accepted title to any of the real properties involved in the sale. He further stated that following the meeting the petitioner "went on more or less of a crash program to come up with all of the curative requirements" as to a substantial number of the real properties involved in the sale.

The petitioner has shown that during the period June 21, 1956, through March 6, 1957, it made payments totaling $41,142.13 with respect to matters relating to certain of its properties involved in the sale and that of the total so paid $37,642.13 was paid during the approximately first 6 weeks following the close of its fiscal year ended May 31, 1956. Although the petitioner has shown that the payments were made after the close of its fiscal year ended May 31, 1956, it has not shown that the factors essential to a determination that the payments would be required and in the amounts shown were not known or ascertainable at the end of its fiscal year 1956. The mere showing that the payments were made during the petitioner's fiscal year 1957 does not establish that the factors essential to a determination of the petitioner's liability for and the amounts of the payments were not known or ascertainable in the petitioner's prior fiscal year.

From a careful consideration of the evidence relied on by petitioner, we are unable to find that it has shown that all of the factors essential to the computation of the gain resulting from the sale of its properties to Phillips were not known or ascertainable at the end of its fiscal year 1956.

Although generally questions concerning the time when sales of property constitute completed transactions for Federal income tax purposes must be determined upon the particular facts and circumstances of each case, there are nevertheless certain broad criteria for decision enunciated in decided cases. The cases relied upon by petitioner fall within that line which deals with executory contracts in which cases decision has been for the taxpayer. *Samuel C. Chapin*, 12 T.C. 235, affd. 180 F. 2d 140 (C.A. 8); *Lucas* v. *North Texas Co.*, 281 U.S. 11, affirming 7 B.T.A. 1193; *R. J. Darnell, Inc.*, 18 B.T.A. 125, affd. 60 F. 2d 82 (C.A. 6). Those relied on by respondent are *Standard Lumber Co.*, 28 B.T.A. 352; *Union Pacific Railroad Co.*, 32 B.T.A. 383, affd. 86 F. 2d 637 (C.A. 2); *Spring City Co.* v. *Commissioner*, 292 U.S. 182; *Key Homes, Inc.*, 30 T.C. 109, affd. 271 F. 2d 280 (C.A. 6); *Commissioner* v. *Hansen*, 360 U.S. 446, which deal with completed as distinguished from executory contracts in which cases decision has been for respondent. From our consideration of the record herein we are of the opinion that the transaction here involved falls within the scope of the latter line of decisions.

The parties to the agreement of sale clearly indicated by the terms of their agreement, that as of the closing date, November 30, 1955, all incidents of ownership in the properties involved were to pass to the purchaser and that thereafter the sellers were to exercise no dominion over them whatsoever. These intentions were effectuated on the closing date. The sellers thereby disposed of the properties involved in the agreement and the purchaser acquired those properties for $2 million which it had made payment of several days before. The fact that $250,000 of the foregoing amount was placed in escrow pending perfecting of titles does not alter the fact that the amount was, by virtue of the terms of the escrow provisions of the agreement of sale coupled with petitioner's liability thereunder to provide clear title, nevertheless payment to the sellers at that time. This is true because the amount could be released from escrow only to defray the sellers' debt represented by the expense of fulfilling their contractual obligation to produce clear title or to reimburse the purchaser in agreed amounts in case clear title was impossible of attainment in any instance. It therefore follows that petitioner in its taxable year ended May 31, 1956, received its full purchase price for its properties involved in the sale and that the amount thereof must be included in its income for that fiscal year in computing its capital gains. Having reached the foregoing conclusion we hold that the gain from the sale was not includible in the petitioner's income for its fiscal year 1957 as contended by it.

The record is silent as to whether in determining the deficiency for the fiscal year 1956 the respondent has included the $41,142.13, expended by petitioner in its fiscal year 1957 in meeting title require-

ments, in the petitioner's basis or cost of $608,596.16, determined and used by him in computing the petitioner's gain on the properties it sold or whether he has allowed the amount so expended as a deduction for the fiscal year 1957. In this state of the record and since the petitioner has abandoned the issue relating to the respondent's determination of the amount of its gain on the sale, we make no determination as to the treatment to be accorded the $41,142.13.

*Decision will be entered under Rule 50.*