Forest G. Smith, Jr., and Rose Mary Smith v. Commissioner.
Smith v. Commissioner
Docket No. 88095.
United States Tax Court
T.C. Memo 1962-128; 1962 Tax Ct. Memo LEXIS 181; 21 T.C.M. (CCH) 664; T.C.M. (RIA) 62128; May 28, 1962
Ernest R. Mortenson, Esq., 961 E. Green St., Pasadena, Calif., and Eugene Harpole, Esq., for the petitioners. Karl M. Samuelian, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Deficiencies in the Federal income tax of petitioners have been determined by respondent for the taxable *182 years and in the respective amounts as follows: 1954
$66,551.05
1955
7,835.30
1956
11,479.32
By amendment to his answer, respondent claims an additional deficiency for 1956 in the amount of $5,735.29 or a total for that year of $17,214.61. The parties have by stipulation resolved all except two of the issues raised by the pleadings. The remaining issues are (1) whether a completed sale of the Clock Restaurants took place in 1956 as contended by respondent or in 1957 as urged by petitioners and (2) should it be held the sale was completed in 1956, whether the entire gain thereon is taxable to petitioners in that year. Findings of Fact The facts which have been stipulated are found accordingly. Petitioners are husband and wife residing in Newport Beach, California, who filed their Federal income tax returns for the years at issue with the district director at Los Angeles, California. Petitioner as hereinafter used has reference to Forest G. Smith, Jr. In 1956, B.D.S. Company, a California limited partnership in which petitioner was a general partner, held a sublessee's interest in the properties wherein the Clock Restaurants, a restaurant chain owned *183 and operated by petitioner, were located. Such subleases also covered some of the restaurant equipment. B.D.S. had, prior to 1956, in turn subleased such premises and equipment to petitioner which sublease was still in effect on October 30, 1956. On October 30, 1956, Smith and Robert O. Peterson, sometimes hereinafter referred to as Peterson, entered into a "Memorandum Agreement." The Clock Restaurants and Smith's interest in B.D.S., which will be referred to collectively as the Clock Restaurants, were sold by Smith to Peterson pursuant to the aforesaid Memorandum Agreement. The Memorandum Agreement provided as follows: MEMORANDUM AGREEMENT Los Angeles, California 10/30, 1956. THIS MEMORANDUM AGREEMENT, made and entered into and executed by and between FOREST G. SMITH, JR., hereinafter referred to as Smith, and ROBERT O. PETERSON, hereinafter referred to as Peterson. WITNESSETH: WHEREAS, Smith is a sublessee under a master sublease dated April 1st, 1953, entered into and executed with B.D.S. Company, a limited co-partnership, as master sublessor, reference to said master sublease being made for full particulars; and WHEREAS, Smith is the operator of that certain business *184 known and designated as CLOCK RESTAURANTS, including all of the premises referred to in said master sublease, excepting Clock Restaurants generally described and known as Nos. 11, 15 and 16, but including also those certain Clock Restaurants known as Nos. 17, 18 and 19; and WHEREAS, Smith has furnished to Peterson a financial statement dated September 30, 1956, purporting to show the assets of Smith owned by him in connection with said Clock Restaurants, including Clock Restaurants Nos. 17, 18 and 19, and showing total assets of $581,756.38, including an asset designated as "Contracts receivable - B.D.S. Company" in the amount of $333,500.00, hereinafter referred to as Exception No. 1, and including also an asset designated as "Accounts receivable - B.D.S. Company re fixed asset acquisition" in the amount of $20,802.16, hereinafter referred to as Exception No. 2. NOW, THEREFORE, in consideration of the premises and the mutual covenants and conditions herein contained, the parties hereto agree as follows: (1) Smith does hereby sell, assign and set over to Peterson all of the assets as disclosed by said financial statement with the exception of Exceptions No. 1 and No. 2. Smith *185 does hereby sell, assign and transfer to Peterson all of Smith's right, title and interest, and capital account as a general partner, in and to that certain limited partnership known and designated as B.D.S. Company, subject only to the consent of the general and special partners of said limited partnership to the substitution of Peterson as a general partner in the place and stead of Smith. (2) Smith does hereby sell, assign, transfer and set over to Peterson all of Smith's right, title and interest as sublessee in and to the master sublease referred to in the premises on condition that Peterson assume all of the obligations of the master sublessee as therein provided, and on the further condition that the master sublessor consents to said assignment and also on the further condition that Smith be relieved of all obligations and liabilities under said master lease which may hereafter accrue. (3) Smith does hereby sell, transfer and set over to Peterson all of Smith's right, title and interest in and to Clock Restaurants Nos. 17, 18 and 19. (4) Peterson hereby agrees to accept all of the above and foregoing assets referred to in paragraphs (1), (2) and (3) and to pay therefor *186 by taking them subject to the liabilities as shown and disclosed on said financial statement dated September 30, 1956, in the amount of $890,450.17, exclusive of the item designated therein as "Accrued rent payable - B.D.S. Company" in the amount of $305,481.17, thereby reducing the liabilities to $584,969.00, plus liabilities and assets that have been accrued in the normal course of business in the operation of Clock Restaurants by Smith from and after the date of said financial statement to the date that Peterson takes possession of said Clock Restaurants. (5) Smith does hereby indemnify and save Peterson harmless from any loss or liability by reason of any liabilities of Smith other than those shown and set forth in said financial statement of September 30, 1956, and those incurred in the normal course of the operation of said business from and after the date of said financial statement to the date that Peterson takes possession of said Clock Restaurants. Any assets acquired and retained by Clock Restaurants from the date of said financial statement of September 30, 1956, to the date that Peterson takes possession of said Clock Restaurants are hereby likewise transferred, assigned *187 and set over to Peterson. (6) Peterson has analyzed the liabilities of Clock Restaurants as shown by said financial statement of September 30, 1956, and understands that there are presently outstanding approximately $30,000.00 of checks issued by Clock Restaurants to its creditors and that no funds are in the bank account of Clock Restaurants from which said checks can be paid and that sufficient funds must be deposited in the bank account of Clock Restaurants to cover said checks forthwith. Peterson further understands that approximately $116,000.00 of taxes will become delinquent on the 31st day of October, 1956, which taxes represent payments due the United States Government for withholding and excise taxes, and to the State of California for unemployment and sales taxes. The parties hereto mutually understand and agree that there would not be sufficient time to consummate this transaction through a bulk sales escrow in time to pay the above referred to immediately pressing obligations, and that, accordingly, in the event that Peterson advances funds in the sum of $146,000.00 with which to pay said pressing obligations, that Peterson will concurrently therewith be delivered the *188 immediate possession of all of the Clock Restaurants and the assets which are the subject matter of this agreement, and that thereafter upon the written demand by Peterson a bulk sales escrow will be opened for the consummation of the transactions contemplated by this agreement, and that if the creditors of Clock Restaurants prevent the consummation of said escrow by requiring immediate payment of their respective claims, Peterson will have the right and privilege of delivering possession to Smith or to any person entitled thereto of such of the assets being transferred by Smith to Peterson under this agreement which are subject to attack by said creditors and shall be relieved of any obligations or liabilities for the payment of said creditors' claims. As to any funds advanced by Peterson for the payment of any of the creditors of Clock Restaurants, Smith agrees to reimburse Peterson upon demand for repayment of said advances. As to any assets hereby transferred by Smith to Peterson which are not subject to attack by Smith's creditors, Peterson shall be entitled to keep and retain the same without the payment to Smith or to the creditors of Smith or of Clock Restaurants of any sum *189 or other consideration therefor. (7) The parties hereto mutually agree to execute any and all instruments or documents upon demand that may be required or convenient for the consummation of any or all of the transactions herein contemplated. (8) Smith agrees to assist Peterson in the obtaining of any extensions or renewals of leases now held by Smith or any corporations in which Smith has an interest, but Smith is not to incur any liability in the negotiation of any such leases or assignments. (9) In the event that the bulk sales escrow hereinabove referred to is consummated and closed, Peterson agrees to indemnify Smith and hold Smith harmless from any loss or liability by reason of or arising out of the conducting of the business of Clock Restaurants by Peterson incurred subsequent to the date of the delivery of possession of said restaurants to Peterson. Until the closing of said bulk sales escrow, Peterson will operate as agent for Smith in the conducting of the business of said Clock Restaurants by Peterson, but Peterson does hereby agree to indemnify and hold Smith harmless from any loss or liability for any debts, obligations or liabilities incurred by Peterson in the *190 operation of said restaurant business from and after the date that Peterson takes possession. (10) The parties hereto mutually agree that the transfer of the interest of Smith as a general partner in B.D.S. Company to Peterson shall be deemed and considered as transferred subsequent to the acknowledgement by B.D.S. Company of the receipt from Clock Restaurants of the rental of $305,481.17. (11) Smith hereby acknowledges receipt of the sum of $10,500.00 paid by Peterson for deposit in the bank account of Clock Restaurants and as part of the payment required to provide funds to cover outstanding checks of approximately $30,000.00 as referred to in paragraph (6) above, and Smith agrees that said sum of $10,500.00 has been or will be used solely for said purpose and that as a result thereof Peterson will be required to advance only the additional sum of $135,500.00. (12) This Memorandum Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators and assigns of the parties hereto. IN WITNESS WHEREOF, the parties hereto have set their hands hereto the day and year first above written. /s/ FOREST G. SMITH, JR. Forest G. Smith, Jr. *191 /s/ ROBERT O. PETERSON Robert O. Peterson On or about November 1, 1956, Peterson took possession of the Clock Restaurants which were the subject of the above agreement. Petitioners' adjusted basis for the computation of gain for the assets which were sold by Smith to Peterson pursuant to their agreement of October 30, 1956, was $290,134.40. On October 31, 1956, Smith had liabilities of $603,687.96 which pertained to the Clock Restaurants. As part of the consideration for Smith's sale of the restaurants to Peterson, Peterson assumed these liabilities. On pages 19, 20, and 21 of petitioners' 1956 income tax return the following statement appeared: Taxpayer sold remaining 12% interest in Clock Restaurants as of 10/31/56 based on a balance sheet as of September 30, 1956. The following Balance Sheet discloses all the assets and liabilities finally assumed by the purchaser. Since the taxpayer received only a non-negotiable contractual obligation to pay the liabilities assumed and since no other consideration was received, the taxpayer elects to report the gain on the sale as a deferred payment sale. Income will be reported only when the amount of liabilities liquidated exceeds *192 the cost of the assets sold. [Here there is set forth a list of assets totaling $284,983.09 and a list of liabilities totaling $603,687.96.] Totals
$284,983.09
$603,687.96
284,983.09 Excess of liabilities assumed over assets acquired… 318,704.87 As of December 31, 1956 $142,493.39 had been paid on liabilities assumed. On or about November 1, 1956, B.D.S. joined petitioner and Peterson in the execution of an assignment by petitioner to Peterson of petitioner's interest in the "Master Sublease" and B.D.S. therein completely released petitioner from any further liability thereunder. On the same date, petitioner, in writing, assigned to Peterson all of his interest in B.D.S. including his capital account therein. The assignment was on the same date formally accepted by Peterson and formally consented to by the general and limited partners comprising B.D.S. At the execution of the October 30, 1956 sales agreement, Peterson advanced the amount of $150,000 which was used to discharge certain of the obligations of petitioner subject to which ownership of the Clock Restaurants was transferred. Peterson's understanding of the terms of the October 30, 1956, sales *193 agreement was that he was thereby personally assuming petitioner's debts therein referred to. By letter mailed on or about November 30, 1956, Peterson circularized petitioner's creditors in an attempt to gain their consents with respect to payment of existing accounts payable referred to in the sale contract and current accounts. The terms of the letter were couched in terms of prospective sale in pursuance of the Bulk Sales Act of California. Nearly all of such letters were returned with the acceptance of their terms by the creditors by December 31, 1956. No such creditor pressed for payment of his account to the extent Peterson, under the terms of the sales agreement, returned to petitioner any of the assets purchased by him thereunder. During 1956 Peterson paid on such debts the amount of $326,443.08 and during 1957 the amount of $220,271.34 was paid either by Peterson or B.D.S. to which he had sold the Clock Restaurants during that year. During the period from and after, on or about November 1, 1956, through December 31, 1956, the Clock Restaurants were under the exclusive control and management of Peterson. Smith had nothing whatsoever to do with the operation of the restaurants *194 subsequent to, on or about November 1, 1956. Peterson maintained books of account for his operation of the restaurants from and after that date. Peterson received the income and paid the expenses of the restaurants during the period from, on or about November 1, 1956, through December 31, 1956. He reported the income from the restaurants for that period on his 1956 income tax return. Peterson was not asked to and did not in fact account to Smith for his operations of the Clock Restaurants from and after, on or about November 1, 1956. Neither Peterson nor his attorney ever demanded of Smith that a bulk sales escrow be opened. A bulk sales escrow was never in fact opened in connection with Smith's sale of the restaurants to Peterson. Peterson and his attorney felt that there was no need for a bulk sales escrow because (a) they felt they had uncovered the liabilities of the business and (b) after taking possession they contacted Smith's creditors and the creditors indicated they would not press for immediate payment of their accounts. At the time of the execution of the agreement of October 30, 1956, between Smith and Peterson, the fair market value of Peterson's assets exceeded his *195 liabilities by approximately $300,000-$400,000. Peterson's sale of the Clock Restaurants to B.D.S. was in writing effective as of January 1, 1957. The sale was made subject to any remaining balance due upon the debts of petitioner referred to in the October 30, 1956, sales agreement and acknowledgment was made by Peterson that he had thereby assumed such liabilities of petitioner. B.D.S. thereupon, by letter, circularized petitioner's creditors referred to in the October 30, 1956, agreement in much the same manner as had Peterson in November 1956. In each letter B.D.S. specifically assumed the balances payable on such indebtedness. All such creditors accepted the terms set forth in these letters. On their 1956 income tax return, petitioners reported income from B.D.S. as follows: Schedule H. Income from Partnership
B.D.S. Co., 801 Stone Canyon Road
Los Angeles 24, Calif.
Fiscal year 4/1/55- 3/31/56
$ 6,268.03
4/1/56-12/31/56
28,176.57
Total
$34,444.60 The above figure of $28,176.57 represents Smith's distributable net income from B.D.S. for the period April 1, 1956, to October 31, 1956. Smith was not credited with any income or loss from B.D.S. subsequent *196 to October 31, 1956, nor did petitioners report any income or loss from B.D.S. for any period or periods after October 31, 1956. In their income tax return for 1956, petitioners treated their sale of the Clock Restaurants as having taken place October 1, 1956. The books and records of petitioners, insofar as they pertain to the businesses operated by petitioner, including the operation of the Clock Restaurants which were the subject of the agreement of October 30, 1956, were kept on an accrual method of accounting, and the income or loss therefrom is also reported on an accrual method of accounting. Nonbusiness items of income and deductions are reported by petitioners on the cash basis of accounting. Petitioners' books and records pertaining to nonbusiness items of income and deductions were kept on the cash method of accounting. On or about July 10, 1957, petitioners filed with the district director at Los Angeles an application for extension of time for filing their 1956 income tax return, in which application the following statement was made: It is impossible to accurately determine our taxable income, inasmuch as the selling price and terms on the sale of one of my business *197 enterprises, made in December of 1956, are still in negotiation. We expect our attorneys to settle all details in the next 90 days. On their 1957 income tax return, petitioners stated that they sold the Clock Restaurants in 1956. In that return, the following schedule appears: Selling
Cost or
Depreci-
Gain
Description
Acquired
Sold
Price
Basis
ation
(Loss)
Sale of Clock Restaurants as re-
ported in 1956 Return as a de-
ferred payment sale
Paid in 1957
1952
1956
$220,271.34
0
$220,271.34
The sale by Forest G. Smith, Jr., of the Clock Restaurants to Robert O. Peterson was a closed and completed transaction in the calendar year 1956. Opinion The sale by petitioner to Peterson of the Clock Restaurants was completed at the latest on November 1, 1956. Petitioner's contention that it was not completed until sometime in 1957 is based upon the following factors as set forth in his original brief: FIRST: There was the condition that a bulk sale escrow would be opened upon the written demand of Peterson for consummation of the transaction; SECOND: If the creditors of Clock Restaurants prevented consummation of the escrow by *198 requiring immediate payment of their claims, Peterson was entitled to a return of any money he had advanced the creditors and had the right to return the property involved to Smith; THIRD: The parties agreed to execute any documents required or convenient for consummation of the transactions contemplated; FOURTH: Until the bulk sales escrow was closed Peterson was to operate Clock Restaurants as the agent of Smith; FIFTH: The consent of the lessors to the assignment of Clock Restaurant leases was to be obtained. The contract provision relating to a "bulk sale escrow" was an option granted to the purchaser which he could exercise or not as he saw fit. Its purpose if exercised was to secure funds for the payment of any debts (which were obligations of petitioner) which might be disclosed in excess of those to be assumed by the purchaser as the purchase price of the restaurants. Even if exercised the escrow could not effect a delay of completion of the sale legally speaking for the payment of such debts would be but to discharge petitioner's obligation. Cf. Consolidated Gas & Equipment Co. of America, 35 T.C. 675. In any event the escrow provision could constitute *199 no more than a condition subsequent which does not affect the finality of the sale. The provisions of California Civil Code, section 3440.1, protect the creditors of a bulk seller, but in noway affect the finality of a bulk sale as between the seller and purchaser. However viewed the bulk sale escrow provision of the contract before us did not constitute a condition precedent to the taking effect and completion of the sale as between the parties thereto. The same is true of the provision of the sales contract granting an option to the purchaser to return to petitioner, the seller, such of the assets conveyed as were endangered by an attack by their encumbrances. The attack never took place. The condition was subsequent by its nature to the completion of the sale. Standard Lumber Co., 28 B.T.A. 352; The Boston American League Base Ball Club, 3 B.T.A. 149; Consolidated Gas & Equipment Co. of America, supra. Petitioner's contention that the provisions of the *200 sale contract calling for the execution of such documents as would effectuate the sale constituted conditions precedent to the sale is without merit in law or fact. In any event there is no evidence here that such documents were not executed and the contention therefore lacks substance. The sales contract does contain a provision that until the closing of the bulk sales escrow the purchaser was to act merely as the petitioner's agent, but we find nothing in that provision which would prevent the sale of the Clock Restaurants from being completed during 1956. The fact is that no escrow was at any time determined to be necessary by the purchaser and none was established. Not only did the existence of the agency depend upon the term of the bulk sales escrow, but, under the terms of the sale contract, it could exist only in conjunction with such an escrow which never was created. It is clear to us that no agency relationship existed between the seller and purchaser here. Lastly, petitioner contends the sale of the Clock Restaurants was conditional upon the obtaining of the consent of the lessors of the restaurant properties and that because certain of them had not so consented until *201 sometime in 1957, the sale was not complete until that year. A search of the sale contract fails to disclose any such provision. Neither the "Master Sublease," assigned to petitioner in 1956 by B.D.S., nor any other lease or sublease is in evidence, and we are therefore unable to determine whether the consents are required under those documents. The fact is that the owners of leased properties would have been bound by their lease to B.D.S. which, after being assigned to petitioner, was by him in turn assigned to the purchaser in 1956. From the evidence before us we do not understand that such owners of leased Clock Restaurant properties could have under any theory prevented the purchaser from taking possession of and operating the restaurants in their respective locations in 1956. We hold the sale was not delayed in its completion on this ground. Petitioner contends further that generally the intent of the parties to the October 30, 1956, sales agreement that it remain executory only is evidenced by the letters circularized on November 30, 1956, to creditors of Clock Restaurants by the purchaser couched in terms of prospective sale and notices of intended sale filed and published *202 in pursuance of the California Bulk Sales Act by petitioner in February 1957. The reason we are not impressed by this contention is the same as that set forth above with respect to petitioner's contention based upon the "bulk sale escrow." The cited California law would, it is true, nullify any sale in fraud of creditors, but would not affect the finality of a sale between the parties thereto. Jeffery v. Volberg, 159 Cal. App. 2d 815, 324 P. 2d 964; Bumb v. United States, 276 F. 2d 729 (C.A. 9). We are more impressed by the contents of petitioner's 1956 income tax return wherein he has treated the transaction here in controversy as a sale taking place in that year. We think he was right then and wrong now. Peterson, the purchaser, took possession of and operated the Clock Restaurants in 1956 without let or hindrance from petitioner. He in no way comported himself from that time forward as an agent of petitioner, but rather as the unfettered owner of the restaurants. Even the conditions petitioner claims render the sale contract executory never arose. The cases cited by petitioner on this point are each distinguishable for the reason that each deals with *203 an executory contract rather than, as here, a contract the conditions of which are subsequent only. We hold the sale to have been completed on October 30, 1956. Petitioner's further contention is that even though it is held that a completed sale took place in 1956, he cannot be held to have realized gain thereon for the reason that the purchaser's contract to take the Clock Restaurant properties "subject to" their encumbrances does not constitute a consideration which is susceptible of valuation and therefore does not constitute realized gain under section 1001(b) of the Internal Revenue Code of 1954[1] in that such a contract is not "property (other than money) received" by him. We think petitioner has picked the wrong target; that the real issue is whether he has received "money" or its equivalent. *204 It is true that the sales agreement provided that Peterson was to take the Clock Restaurants "subject to" the liabilities and debts of petitioner enumerated therein, but there is ample evidence both within the terms of the contract and extrinsic thereof in the actions of the parties to warrant the conclusion that it was intended by both that Peterson was personally to assume petitioner's obligations as the purchase price of the restaurants. Petitioner did not testify herein, but Peterson, the purchaser, did testify that it was his understanding of the agreement that he was thereby assuming and agreeing to pay the indebtedness of petitioner there listed. He carried out this understanding during 1956 by making new agreements with each of the creditors to discharge such indebtedness. In his 1957 agreement to sell the Clock Restaurants to B.D.S., Peterson made repeated reference to his prior assumption of petitioner's debts. It is inconsistent with the lack of personal liability on the part of Peterson that in the October 1956 agreement petitioner agrees to hold him harmless from "loss" or "liability" arising from encumbrances upon restaurant property in excess of those listed therein *205 and to relieve him of "any obligations or liabilities" with respect to property returned to petitioner because creditors had pressed for immediate payment of their claims. In his income tax return for 1956 petitioner repeatedly treats the obligations listed in the sale contract as having been assumed by Peterson. The substance of this transaction is as though in return for his receipt of the Clock Restaurants, Peterson had agreed to pay money to petitioner in the amount of the debts specified in the sales agreement and petitioner had agreed to use such funds for the discharge of such liabilities. The agreement by one to discharge the personal obligation of a taxpayer for a valid consideration is tantamount to the receipt of cash by the taxpayer in the amount of such obligation and this is so even though the discharge of the obligation is effectuated only by the transfer of the taxpayer's property subject to his debts. Crane v. Commissioner, 331 U.S. 1. Viewing the transfer of petitioner's property subject to his debts as the substantial receipt of "money" in the amount of such debts within the meaning of section 1001(b) of the 1954 Code, we do not find it necessary *206 to decide whether or not the sale contract itself possessed a fair market value. Because of adjustments to be made with respect to the deficiency under the stipulation of the parties. Decision will be entered under Rule 50. Footnotes
1. SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS. (a) Computation of Gain or Loss. - The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. (b) Amount Realized. - The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. In determining the amount realized - (1) there shall not be taken into account any amount received as reimbursement for real property taxes which are treated under section 164(d) as imposed on the purchaser, and (2) there shall be taken into account amounts representing real property taxes which are treated under section 164(d) as imposed on the taxpayer if such taxes are to be paid by the purchaser.↩