MAJOR REALTY CORPORATION & SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Major Realty Corp. v. Commissioner
Docket No. 4871-75.
United States Tax Court
T.C. Memo 1981-361; 1981 Tax Ct. Memo LEXIS 386; 42 T.C.M. (CCH) 373; T.C.M. (RIA) 81361; July 13, 1981. *386 Petitioner transferred a deed to 175 acres of land pursuant to a contract of sale. Under a Supplemental Contract, the parties agreed that the purchaser could choose another 175 acre parcel if the first was not suitable. Petitioner received a purchase money mortgage for 99 percent of the purchase price. Petitioner had the right to rescind the sale subsequent to closing if certain conditions were not met. Interest on the note would not accrue until after the expiration of the right of rescission. The conditions were not met by the purchaser and petitioner rescinded the sale. Upon rescission, petitioner returned the purchaser's downpayment and cancelled the note. Held, the transfer of the deed was not an option disguised as a sale for tax purposes. Held, further: Land sold by petitioner, a real estate development company, was not held for an investment. Therefore, it is taxable as ordinary income. James A. Urban and Bradley J. Davis, for petitioners. Thomas K. Purcell, for respondent. IRWIN
MEMORANDUM OPINION IRWIN, Judge: Respondent determined a deficiency of $ 141,953 in petitioners' consolidated Federal income tax for the taxable year ending May 31, 1972. Due to concessions *387 by both sides, the only issues presented for our consideration are: (1) Whether the transactions herein described between petitioners and the Edward J. DeBartolo Corporation for the transfer of 175 acres of land constituted a completed sale or was, in substance, an executory contract for the sale of land or an option; (2) whether property was held by petitioner for investment or for sale to customers in the ordinary course of petitioners' trade or business. All of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Major Realty Corporation (hereafter Major or petitioner) and its wholly owned subsidiaries are corporations with their principal place of business in Orlando, Florida at all relevant times. Petitioners timely filed a consolidated income tax return for the taxable year ending May 31, 1972 with the Internal Revenue Service Center, Chamblee, Georgia. Petitioners filed their return using the accrual method of accounting and the fiscal year ending May 31. References to petitioner hereafter are solely to Major. Major is a publicly held corporation incorporated in Delaware *388 on July 27, 1959. It was formed for the purpose of engaging in a general real estate business, including purchasing, leasing or otherwise acquiring, owning, developing, using, holding, selling, conveying, exchanging, mortgaging and financing real property. Major initially intended to focus primarily on the acquisition and sale of large, unimproved tracts of real estate and the development of tracts with others for residential or other purposes. By February 1960 Major had acquired 87 unimproved tracts of land in Florida totaling approximately 65,000 acres. Major had property held for sale with a cost basis of $ 21,819,008 and $ 15,032,438 at its fiscal years ending May 31, 1962 and 1965, respectively. In early 1967 Major hired R. F. Raidle as its new president. His initial objectives were to dispose of properties other than the Orlando properties (a 2,500 acre tract, hereafter referred to as the Major Center property), to improve Major's financial condition, and to prepare a master land use plan for the development of the Major Center property, based in large part upon the expected impact of Disneyworld. This land was part of Major's original 65,000 acre holding and was its principal *389 asset as of 1971. The plan called for construction of a regional retail shopping center (hereafter the Mall), with approximately 1.5 million feet of retail floor space, office buildings, industrial parks, high density residential units and major accommodations for travelers. Discussions concerning the Mall were begun with the Edward J. DeBartolo Corporation (hereafter DeBartolo) [1] *390 by October 1967. [2] *391 DeBartolo's customary method of acquiring and developing shopping mall sites was through wholly-owned subsidiaries. Usually, DeBartolo would provide an initial capitalization of $ 5,000 to the subsidiary and the subsidiary would then execute a lease or contract for the lease or purchase of a shopping mall site and take title to or possession of the property. At other times, the leases or contracts would initially be executed by DeBartolo and assigned to the subsidiary. Neither DeBartolo nor any of its subsidiaries has ever defaulted on any contract for the purchase of a mall site. On March 31, 1968, Major, as transferor, and DeBartolo, as transferee, entered into a Contract of Sale and Purchase for: A tract of land of not less than 100 acres and not more than 175 acres located at the Southwest corner of the intersection of Kirkman Road and Orlando-Vineland Road. The exact dimensions of the tract shall be selected by Buyer, and approved by Seller, prior to closing, and verified by survey furnished by Seller. The Eastern boundary shall be the West right-of-way line on Kirkman Road, the Northern boundary shall be the South right-of-way of Orlando-Vineland Road, and the West boundary shall be parallel to Orlando-Vineland Road. The purchase price was $ 20,000 per acre, based upon the final number of acres as determined *392 by the Buyer and approved by the Seller. A sum of $ 25,000 was deposited in escrow as earnest money. Paragraphs 3.A. and 3.B. of the contract contained the following covenants: A. Of Seller. Seller covenants that it is vested with fee simple title to the subject property and has power to sell the same. Seller further covenants that the said property has been duly annexed to the City of Orlando, that City utilities, including City sanitary sewerage and water, are or will be available to the site without cost to the developer (other than on-site improvements and standard connection charges) and that the property, by closing or within one hundred twenty (120) days thereafter, will be zoned so as to permit the use of the property as a retail shopping center. B. Of Buyer. Buyer covenants that it is acquiring the property for development and use primarily as a regional mall type retail shopping center. It further covenants that it will commence construction of a retail shopping center on said property no later than June 1, 1969; provided, however, that said date can be extended until a date not later than June 1, 1970, if, prior to June 1, 1969, Buyer furnishes to Seller evidence that *393 it has secured leases or letters of intent from at least one major department store for stores in said shopping center, and a construction schedule providing for construction to commence not later than June 1, 1970. Paragraph 7 of the contract dealing with defaults provides in part: If, prior to closing, the Seller fails to perform any of the covenants of this Contract, the aforesaid deposit shall be returned to the Buyer, on demand. If the Seller fails to perform any of the covenants of this Contract required to be performed after closing, the Buyer may elect to rescind this transaction and to receive back from the Seller all sums previously paid to the Seller. * * * If Buyer fails to perform its covenant to commence construction on or before June 1, 1969 (or June 1, 1970), Seller shall have sixty (60) days thereafter in which to elect to rescind this transaction, in which event Buyer agrees to reconvey the property to Seller and to turn over to Seller all feasibility studies, engineering studies and architectural plans obtained by Buyer up to that time, in consideration of which Seller will return to Buyer all sums previously paid by Buyer to Seller, and cause Buyer's note and *394 mortgage to be satisfied and discharged. At the time the contract of sale and purchase was executed, DeBartolo considered the covenants imposed upon it under paragraph 3.B. to be acceptable. While Edward J. DeBartolo, the President of DeBartolo, thought that the initial deadline was optimistic, based upon his personal relationship with one of the directors of Major Realty Corporation, he never thought that there would be a problem in getting an extention of the time requirements under the contract if DeBartolo could not comply with the covenants within the time stated. Following the execution of the contract on March 31, 1968, representatives of DeBartolo made extensive efforts to secure tenants for the shopping mall through personal contact and correspondence and by accompanying prospective tenants to the site. Such prospective tenants included, among other, Jordon Marsh, Iveys, Sears, Penneys, Montgomery Ward and Woolworth. In addition, numerous businesses and individuals wrote to Major expressing an interest in acquiring space as tenants in the proposed Mall. These inquiries were forwarded to DeBartolo. At all times up to the eventual reconveyance of the property by DeBartolo *395 to Major, DeBartolo intended to use the property to construct a shopping mall, and from March 1969 up to the reconveyance of the property, DeBartolo was actively seeking an extension of time within which to comply with the covenants of paragraph 3.B. of the contract of sale and purchase. The contract between DeBartolo and Major also gave DeBartolo the right to assign its interest in the contract to a subsidiary or affiliated corporation. The assignment would release DeBartolo from all its further obligations under the sales contract. On April 16, 1968, DeBartolo assigned the contract to its wholly-owned subsidiary, Florida Mall Corporation (hereafter Florida Mall). Florida Mall then released DeBartolo from all further obligations under the contract. At this time, Florida Mall had a capitalization of $ 5,000. The March 31 contract further provided that the seller "shall also pay the cost of Owner's Title Policy in the amount of the purchase price if the amount of the purchase price (including the purchase money note) is paid in full by June 1, 1970." On April 22, 1968, counsel for DeBartolo and Florida Mall wrote to Lawyers Title Insurance Corporation requesting a title insurance *396 binder on the property to be purchased from Major. The letter further advised that although Florida Mall planned to have title to the property transferred to it from Major, the title policy would not be purchased or issued until the purchase price was paid. Because the commencement of construction had not been definitely determined, no reliable estimate of when the policy would actually be issued could be given. On May 21, 1968, Lawyers Title Insurance Corporation issued its interim title insurance binder and on May 22 forwarded the binder to DeBartolo. Two days later, Lawyers Title Insurance Corporation issued its endorsement to the binder and forwarded the endorsement to DeBartolo. At the closing on May 22, 1968, Major delivered a warranty deed for the property to Florida Mall Corporation. [3] Florida Mall delivered to Major its note secured by a purchase money mortgage in the principal amount of $ 3,475,000 [4] payable in two equal annual installments of $ 1,158,333.33 and a final installment of $ 1,158,333.34 due on or before February 1, of 1971, 1972, and 1973, respectively. The note bore interest at 6 percent, commencing on February 1, 1970. DeBartolo paid closing costs of *397 $ 5,216.75. Major and Florida Mall entered into a Supplement to Contract of Sale and Purchase, dated May 23, 1968. The parties agreed that the transaction would be closed by conveying to Florida Mall a parcel of land consisting of 175 acres, as described *398 in the Supplement to Contract of Sale and Purchase, [5] *399 but that Florida Mall could, within 6 months after the closing, [6] select a different parcel of land not less than 175 acres. If the parcel finally selected differed from the parcel of land described in the deed and mortgage, the parties would execute such further documents as might be necessary to correctly describe the land. Florida Mall, however, decided on December 13 to proceed on the basis of the originally contemplated 175 acres, and a formal agreement was reached on March 25, 1969, and was recorded in the public records of Orange County. This agreement also described the land conveyed in greater detail than in the warranty deed. The March 31, 1968 contract provided for the proration of real property taxes between Major and DeBartolo. To protect against the contingency that the taxes on the property would not be separately assessed in the year of sale, however, Florida Mall and Major amended the contract on May 27, 1968 to provide that in such event all real property taxes would *400 be paid by Major and that when separate tax bills became available, Florida Mall would reimburse Major. [7]
On January 14, 1969, DeBartolo commenced negotiations with the First National Bank in Palm Beach for a loan of $ 500,000 to finance part of Florida Mall's predevelopment costs for the Mall. The loan was granted in February 1969 upon the personal guarantee of Edward DeBartolo and his wife. The bank was apparently never told that Major had a right to rescind the sales contract upon Florida Mall's failure to meet the covenants. Interest of $ 8,458.33 was paid on this note by Florida Mall. On May 20, 1969 Edward DeBartolo went to Orlando to meet with Raidle. At the meeting, he consented to the construction of a temporary ditch and the widening of Kirkman Road. In total based upon an estimate prepared by DeBartolo's chief financial officer, predevelopment expenditures by the two corporations amounted to $ 72,344. Florida Mall was apparently unable to secure any leases or a letter of intent from a major department store, and it requested an extension until June 1, 1970 to begin construction but Major refused to grant *401 the request. On July 30, 1969, Major offered to grant an extension until October 1, 1969, but with the understanding that if construction was not started by October 1, Major would have 60 days from October 1 to rescind the transaction in accordance with the terms of the sales contract. Florida Mall rejected Major's proposal. At a meeting held in September 1969, DeBartolo offered to pay the balance of the purchase price in accordance with the terms of the original note and mortgage, if the covenants of paragraph 3.B. of the contract were eliminated or extended. Major refused to grant any additional extension of time and DeBartolo agreed to reconvey the property to Major. [8] On January 19, 1970, Major, DeBartolo, and Florida Mall entered into a Mutual Release Agreement. Major returned the $ 25,000 deposit and cancelled the mortgage from Florida Mall. On March 23, 1970, DeBartolo paid Major $ 9,014.47 as its prorated share of real property taxes for 1968 and 1969. Following the parties' agreement *402 to reconvey the property to petitioner, petitioner contacted other developers of shopping malls in an effort to have one of them acquire the property and construct a shopping mall thereon. Those efforts to sell the land to other developers continued until the time Major agreed to convey the entire Major Center tract, including the former Florida Mall property, to the Major Center Limited Partnership. As of June 27, 1978, no shopping center has been constructed on the Major Center property. As of January 31, 1968, Major had entered into a Note Purchase Agreement with various parties whereby it was agreed, among other things, that Major would issue up to $ 6,000,000 in principal amount of 7 percent secured notes due March 1, 1983. These notes would be secured by an Indenture of Mortgage and Deed of Trust to The First National Bank at Orlando, as trustee, encumbering all of Major's property in Orlando, Florida (including the property subsequently sold to Florida Mall). The Note Purchase Agreement permitted the sale by Major of the property used as collateral, provided that portions of the sales proceeds, including purchase-money mortgages taken back from purchasers, were turned over *403 to the indenture trustee. The Note Purchase Agreement also limited the initial aggregate principal amount of the notes to $ 3,800,000, but authorized the issuance of additional amounts upon deposit with the trustee of additional collateral in the form of new purchase-money mortgages in amounts in excess of certain minimums. By depositing with the trustee, the purchase-money mortgage received from Florida Mall, Major was able to issue additional notes totaling $ 2,200,000. Yet after the reconveyance of the property and the cancellation of the Florida Mall mortgage used to secure the issuance of the additional notes, Major was not required to repay any of such additional notes in advance of their original due dates. Major reported a gain of $ 3,152,170 on the sale of the 175 acres to Florida Mall on its income tax return for its fiscal year ending May 31, 1968. [9] When Major subsequently reacquired the property, it recorded its cost basis at the reacquisition price. Respondent determined that the Florida Mall transaction did not constitute a completed sale as of May 31, 1968, but was an executory contract or option transaction between the parties. Accordingly, the tax basis of *404 the 175 acres (which were subsequently sold in 1972 as part of the sale of the entire Major Center property) was determined to have been improperly increased by Major by the amount of gain recognized. The Securities and Exchange Commission (hereafter SEC) instituted a proceeding pursuant to section 15(c)(4) of the Securities Exchange Act of 1934, to determine whether Major failed to comply with section 13 of the Exchange Act as a result of filing annual reports on Form 10-K for the fiscal years ending May 31, 1968 and 1969 which failed to comply with the Commission's Accounting Series Release Number 95 in relation to the Florida Mall transaction. Major *405 submitted an offer of settlement and, solely for the purpose of that proceeding, consented to findings consistent with the allegations in the Statement of Matters filed by the SEC's Division of Corporate Finance that its annual reports were misleading and deficient in their treatment of the Florida Mall transaction. As a result of the SEC proceedings, Major restated its financial statements. In these restatements, no effect was given to the Florida Mall transaction in Major's fiscal year ending May 31, 1968; the $ 25,000 cash Major received as a downpayment was classified as a deposit liability on its balance sheet for its fiscal year ending May 31, 1969. On December 29, 1971, Major and Gulf OilReal Estate Development Company (hereafter GOREDCO), a subsidiary of Gulf Oil Corporation, entered into an agreement providing for the formation of a limited partnership to be named Major Center Limited with Major and GOREDCO each to own 50 percent. The agreement also provided for the acquisition by the partnership of the 2,500-acre Major Center property. The proposed formation of the partnership and sale of the Major Center property, however, had to be approved by Major's shareholders. *406 If shareholder approval was not obtained by May 1, 1972, the agreement could be terminated by either party without liability. On March 30, 1972, Major sent a formal notice of a special shareholders meeting, along with a proxy statement containing pertinent information concerning the proposed sale of the Major Center property to the Major Center Limited Partnership. Approval was granted at a special meeting held on April 20, 1972. The partnership agreement between petitioner and GOREDCO was executed on April 24, 1972 and a warranty deed transferring the Major Center property to GOREDCO for $ 36,915,883 was executed on that date. The partnership executed a purchase-money mortgage in the amount of $ 30 million in partial payment for the property. The formation of the Major Center Limited with GOREDCO and Major's subsequent sale to it of the Major Center property (later renamed Florida Center) relieved Major of a substantial financial and managerial commitment, and enhanced its financial position. At the same time, Major retained a half interest in the future development and profits of Major Center. Major's management was thus free to pursue new projects and had a greater ability *407 to obtain financing. The sale was also important for the development of the Major Center property itself. Major had forecasted that it would take it between 12 and 15 years to gradually sell or develop the property but with the additional capital GOREDCO could supply, it would take only 4 to 8 years. [10]
All of Major's property was classified as property held for sale through its May 31, 1967 fiscal year. During its fiscal year ending May 31, 1968, however, Major divided its land and holdings into two categories, one entitled "Held for Sale" and one entitled "Held for Development." The only property placed in the Held for Development category was the Major Center property (excluding the 175 acres previously transferred in the Florida Mall transaction). [11] *408 The majority of Major's income for its fiscal years ending May 31, 1969 through May 31, 1972 came from the sale of real estate; for its 1971 and 1972 fiscal years, its major source of income was from the sale of real estate within the Major Center property, its primary asset. In its fiscal year ending May 31, 1968, Major sold approximately 54 acres of land for a total sales price of $ 2,500,000. Sales for the following 6-month period were of 29 acres for $ 2,300,000. Additionally, Major had under contract to sell 67 acres for a price of $ 4,500,000. Sales for its fiscal year ended May 31, 1969 totaled 5,762 acres for $ 2,074,864 and for its fiscal year ended May 31, 1970 totaled 5,211 acres for $ 621,725. Sales of real estate for the following 2 years were all within the Major Center project and totaled $ 2,803,102 in fiscal year 1971 and $ 4,564,660.60 in fiscal year 1972. [12] *409 During the years 1968 through May 31, 1972, prior to the sale of the Major Center property to Major Center Limited, Major spent $ 1,530,708.31 in development costs for platting four subdivisions covering 415 acres and for other improvements, including subdivision streets, utilities, and drainage structures. As of 1969, work was underway by the City of Orlando, the Florida State Department of Transportation, and Major to install and improve roads, sanitary services, water mains, drainage structures, and other site improvements called for in the master plan for the development of the Major Center property. Ideally, Major hoped to be able to develop the property itself or remain as a joint venturer in the development of any property it sold, or possible lease the *410 property. Among the projects Major planned to commence as soon as site improvement work was completed were a 240-room Howard Johnson Motor Lodge, to be owned and operated by a subsidiary of Major, a 200-room Rodeway Inn, to be owned by a joint venture between Major and Rodeway Inns of America, a 160-room Best Western Motor Lodge to be operated by a Daytona Beach, Florida, motor lodge operator on a participating ground lease from Major, a 1,500 seat capacity Valle Steak House Restaurant, a 36,000 square foot office building to be built in a joint venture by Condev Corporation and Major for use as Condev Corporation's headquarters, two 18-hole golf courses to be built and operated by Major, and a 200-unit garden apartment complex to be built by Major. Serious consideration was being given to expanding in the mobile home park field. In addition, Major agreed to form a joint venture with Condev Corporation for development of an office-industrial park, incorporating the Condev Corporation office building. Many other projects were in various stages of negotiation and planning, including an office and headquarters building for Major. During 1969 Major entered into a joint venture with *411 Rodeway Inns in which Major would contribute the land and Rodeway Inns construct the building; they would then split the profits equally. Major also entered into a ground lease with Best Western based upon room rental receipts and food and beverage sales. During the fiscal year ending May 31, 1970, Major constructed an 18-hole golf course, owned and operated by one of its wholly-owned subsidiaries. Construction was also begun on the first 40 units of a 90-unit condominium complex being developed by Major. Major had also entered into a joint venture to develop rental apartment units. In addition, Major sold 8 acres of property to a joint venture for construction in June 1972 of a 17-story Sheraton Hotel. The same joint venture also proposed creation of a 50-acre motel park in which they would purchase a 5-acre site and lease the balance of the ground on a minimum annual rental against 6-1/2 percent of the gross income from the operation of the motels. An option was granted by Major to Blaine Millard to purchase approximately 9 acres of land in Florida Center to construct a Quality Court motel. Major also began developing plans to construct a two-story office building in which *412 it would occupy the top floor for its corporate headquarters and lease the ground floor. Negotiations were begun with Colonel Sanders' Inns to lease a site in the southwest quadrant of the property. In its annual stockholders report for its 1970 fiscal year, Major stated that: We believe that fiscal year 1970 brought us through the point of having achieved necessary engineering, planning and initial development work of our Orlando properties so that these properties would be ready to begin generating returns for your company through sales to other developers or through development by your company. During its 1971 fiscal year, Major consummated sales to Howard Johnson for the construction of a motel and to Valle Steak House Restaurant. Originally, as noted earlier, Major had contemplated that it would build and operate the Howard Johnson (as a franchise) but it decided that it would be more beneficial to sell the site. A new road was being constructed in the southwest quadrant of Florida Center, opening up an an additional 115 acres for sale or development. A service station site was sold to Standard Oil and Major was studying the possibilities of either selling or leasing more *413 such sites. Other inquiries were received by Major to purchase over 40 acres of land within the Florida Center. A second, smaller Sheraton was started in an area called "The Court of Flags," a group of seven hotel-motels covering approximately 19 acres purchased by the Walsh-International Hotels Management Corporation joint venture. Major was also engaged in constructing a 30-unit apartment house in a joint venture with Walden Investment Corporation. During its 1972 fiscal year, Major purchase a 5,800-acre tract of land in Lake County, Florida, for $ 5,800,000. In December 1971 it purchased 640 acres of industrial property south of the Orlando city limits for $ 4,000,000. It platted 85 acres of the property and contracted for its grading, paving, drainage, sewage, and water. While this work was being done, it sold 83 acres of this tract. Construction was started on a five-story building (to be owned by Major). Major also formed a subsidiary, MRC Hotel Corporation, which purchased exclusive franchise rights for La Quinta Motor Inns in four southern states. Major planned on opening a minimum of 20 motor inns, over the subsequent 5 years, which it would own and operate; it also *414 planned to subfranchise. Also during its 1972 fiscal year, Major completed construction of the new road within the Florida Center, thereby opening up several motel and commercial sites for sale. Major also hoped to start construction on two or three large apartment facilities and on a small shopping center on a 18-acre tract which had already been cleared in early 1971. In its consolidated income tax return for its fiscal year ended May 31, 1972, Major reported the sale of the Major Center property as a long-term capital gain. In his notice of deficiency, respondent determined that the transaction did not qualify as a capital gain, but represented ordinary income. As noted before, respondent also increased the gain reported on the 1972 sale by decreasing the claimed basis in the portion of the property which had purportedly been sold to Florida Mall in 1968 and subsequently repurchased by Major. Respondent determined that the increased cost basis taken upon the repurchase was improper; since there had never been a bona fide sale, the 175 acres retained its original pre-1968 basis. Issue 1
We first address the issue of whether the transfer of the warranty deed pursuant to the *415 sales contract constituted a completed sale of the 175 acres, as petitioner contends, or was in substance either a contract for the sale of land [13] *417 or a deposit in exchange for an option, [14] as respondent contends. The question of when a sale is complete for Federal income tax purposes is essentially a question of fact to be resolved by a consideration of all the surrounding facts and circumstances. TennesseeNatural Gas Lines v. Commissioner, 71 T.C. 74 (1978); Baird v. Commissioner, 68 T.C. 115, 124 (1977); Deyoe v. Commissioner, 66 T.C. 904, 910 (1976); Harmston v. Commissioner, 61 T.C. 216, 228 (1973), affd. per curiam 528 F.2d 55 (9th Cir. 1976). Among the factors to be considered in determining when a sale is complete are the transfer of legal title and the shift of the benefits and burdens of ownership of the property. TennesseeNatural Gas Lines, supra; Merrill v. Commissioner, 40 T.C. 66, 76 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). Generally, a sale is completed upon the first of these events to occur. TennesseeNatural Gas Lines, supra.[15] *418 *419 *420 There are no hard and fast rules that can be used in determining when a sale is consummated, however, and no single *416 factor is controlling. The transaction must be viewed as a whole and in light of the surrounding circumstances. Commissioner v. Segall, 114 F.2d 706, 709 (6th Cir. 1940), revg. on other grounds 38 B.T.A. 43 (1938), cert denied 313 U.S. 562 (1941); Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837 (1978); Estate of Franklin v. Commissioner, 64 T.C. 752, 763 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). Cf. Ragghianti v. Commissioner, 71 T.C. 346 (1978), on appeal (9th Cir. March 13, 1979). Thus, whether the transactions are to be construed as constituting an option, an executory contract, or a contract of sale depends not upon any particular phraseology used but rather upon what the parties actually did, gleaned from a consideration of the contracts, the deed, and the surrounding circumstances. Estate of Franklin v. Commissioner, supra. In this regard, respondent contends that the warranty deed transferring title from Major to Florida Mall was, alternatively, either without legal effect under Florida law or a sham (that is, the *421 "sale" had no economic reality and was in substance an option or executory contract even if in form legal and equitable title vested in the purchaser). Respondent, relying on Florida law [16] *422 that a deed without an adequate description of the property conveyed is a nullity, Connelly v. Smith, 97 So.2d 865 (Fla. Dist. Ct. App. 1957), argues that the description of the land purportedly conveyed was so deficient as to defeat any claim that equitable or legal title passed upon execution of the warranty deed. It is respondent's position that the supplement to the contract of sale dated May 23, 1968 and the anemdnent to the contract dated May 27, 1968 (in regard to property taxes) should be considered together with the deed since they were executed on or about the same dates. Doing so creates an ambiguity in the deed (which, standing alone, is unambiguous on its face), argues respondent, because the description of the land in the supplement to contract varied the description in the deed. [17]
Respondent correctly describes the general rule of law in Florida that although there is a strong presumption in favor of the correctness of a deed, a party may overcome that presumption by clear, strong and convincing evidence. See Howell v. Fiore, 210 So.2d 253 (Fla. Dist. Ct. App. 1968). There, two agreements, one a warranty deed absolute on its face and the other a "Repurchase Agreement," were executed as part of the same transaction. The court construed both documents together and, after ascertaining the parties' intent, held that they created a resulting trust. That case, of course, is distinguishable *423 on its facts, but we believe the same principles would apply here. See also J.M. Montgomery Roofing Co. v. Fred Howland, Inc., 98 So.2d 484 (Fla. 1957); Hughes v. Professional Insurance Corp., 140 So.2d 340 (Fla. Dist. Ct. App. 1962). [18] We disagree, however, with respondent's conclusions based on Florida law. We simply to not see any intent by either petitioner or Florida Mall to vary the description in the deed or convey land other than that described in the deed. *424 Rather, we agree with petitioner that, at most, the supplement to the contract gave Florida Mall the right to select an alternate parcel of land, not less than 175 acres, if it determined a better site later. [19] *425 Nor do we agree with respondent that the additional language in the supplemental contract actually varied the description in the deed. Although not entirely clear, it appears that the added language, which describes the land conveyed in terms of the broader description in the original contract (and without the southern boundary since the number of acres was indeterminate), does not describe a tract other than that described in the deed. Even if the warranty deed effectively conveyed legal and equitable title to DeBartolo, however, this is not of itself sufficient to find a completed sale if the substance and economic realities of the transaction indicate that the transfer of the deed was a sham. Where respondent attackes the form of an agreement, this Court will examine the substance of the transaction to ensure that the operation of the tax laws will not *426 be frustrated. Higgins v. Smith, 308 U.S. 473 (1940). See also Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Commissioner v. Sunnen, 333 U.S. 591 (1948); Helvering v. Clifford, 309 U.S. 331 (1940); Helvering v. Lazarus & Co., 308 U.S. 252 (1939). [20] *427 We now deal with the question of whether the transactions involved in substance either an executory contract requiring DeBartolo (or Florida Mall) to purchase the property only if certain conditions were met, or alternatively, an option whereby DeBartolo (or Florida Mall) had the option to purchase if these conditions were met. In either case, the transaction would not be closed for tax purposes. It is unimportant, therefore, whether Florida Mall was required to purchase the property if it met the conditions or simply had the option to do so. It is clear, however, that if it could meet the conditions in the contract of March 31, 1968, Florida Mall had a contractual right to retain the property *428 and that it always intended to comply with the convenants. Respondent points to the following facts [21] *429 in support of his second position that the intent of the parties and the substance of the transaction was to create an option or executory contract (1) under the terms of the contract and mortgage note, Major retained the right to rescind the sale subsequent to closing and interest would not begin to accrue until after the expiration of the initial deadline for Major's exercise of its right of rescission on June 1, 1969; (2) except for a small downpayment, representing less than 1 percent of the purchase price, no payments of either principal or interest were due under the note until February 1, 1971, after the expiration of Major's right of rescission; (3) upon rescission of the contract, Major returned the $ 25,000 down payment and canceled the purchase money mortgage and the only sum paid by DeBartolo or Florida Mall which was not refunded was $ 9,014.47 as its prorated share of real property taxes; (4) Florida Mall, which assumed DeBartolo's obligations, had only nominal assets and the purchase money mortgage securing the purchase price was nonrecourse. Petitioner maintains that the right of rescission does not convert the transaction into an option and that it had an unconditional obligation to receive the purchase price. The distinction between an option and a contract of sale is that an option gives a person a right to purchase at a fixed price within a limited period of time but imposes no obligation on the person to do so, whereas a contract of sale contains *430 mutual and reciprocal obligations, the seller being obligated to sell and the purchaser being obligated to buy. Koch v. Commissioner, 67 T.C. 71, 82 (1976); Carter v. Commissioner, 36 T.C. 128, 130 (1961). Thus, a contract of sale imposes an enforceable obligation to pay the purchase price. Estate of Franklin v. Commissioner, 64 T.C. 752, 763 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). See also Lucas v. North Texas Lumber Co., 281 U.S. 11 (1930); United States Freight Co. v. United States, 190 Ct. Cl. 725, 422 F.2d 887 (1970); Lawler v. Commissioner, 78 F.2d 567, 568 (9th Cir. 1935). In W. A. Drake Inc. v. Commissioner,145 F.2d 365, 367 (10th Cir. 1944), affg. 3 T.C. 33 (1944), the Court was faced with the issue of whether an agreement which gave the vendor the right to cancel upon the purchaser's default was an option to purchase or a completed sale. The Court first noted that "the distinguishing characteristics of an option contract are that it imposes no binding obligation upon the person holding it." In holding that the right of the seller to cancel in the event of default by the purchaser did not convert an otherwise binding contract into an option contract, the Court relied *431 on the fact that the purchaser was bound to perform and did not have the right to cancel; the contract was binding and enforceable from the date of its execution. The critical element distinguishing the transactions is this case from a typical option, as petitioner contends, is that petitioner, as seller, had an enforceable right against the purchaser, DeBartolo (or, after its assignment, against Florida Mall) to require compliance with the payment terms of the note. Moreover, the purchaser or its assignee had a contractual right to retain possession of the land if it performed its obligations under the contract. The purchaser was bound to make payments and did not have the right to cancel the contract even if it did not live up to the convenants. [22] *432 The "option" to enforce the contract was given to the seller, Major. We believe that under Florida law the right of rescission created a condition subsequent which was valid and enforceable against DeBartolo and Florida Mall. A condition subsequent operates to vest title in the grantee subject to a right of termination in the grantor upon the grantee's breach of a failure to perform the express condition. Chace v. Johnson, 98 Fla. 118, 123 So. 519 (Fla. 1929); Genet v. Florida East Coast Railway Co., 150 So.2d 272 (Fla. Dist. Ct. App. 1963). [23] *433 We agree, therefore, with petitioner that the right of rescission did not convert the contract or deed into an executory contract or an option [24] and that Florida Mall was under an unconditional obligation to pay the purchase price and was entitled to possession and the benefits and burdens of ownership under Florida law. Since respondent concedes that the form of the contract was not that of an option, this is not the precise issue here. It is respondent's position that Florida Mall (acting for DeBartolo) had such little economic interest in the property that, in *434 substance it had the option to decide whether to proceed with the purchase even if it was in possession of the property. It is respondent's contention, therefore, that Florida Mall's unconditional obligation to pay the purchase price was without substance and the transfer of the deed was a sham designed to disguise the transactions as a sale. It is not the right of rescission standing alone that is significant, but the right of rescission coupled with the payment schedule that respondent argues shows that the transaction was a sham. In view of the covenant requiring construction to begin within 1 year (or, possibly 2 years), petitioner argues that both parties were aware that the full purchase price was to be paid, if not with the construction loan proceeds, then from the permanent loan on the shopping mall [25] *435 and it is for this reason that the financing arrangement relates to the period for rescission, and not in order to avoid payment by Florida Mall until the period of rescission was met. Such a purchasing arrangement does not appear to us as being unusual [26] although, as noted in footnote 25, the record is silent as to normal financing procedures on Florida projects. Construction loans are typically far in excess of the value of the land and we are aware of other cases in which the purchase price of land was to be paid off using the construction loan. Cf. Otey v. Commissioner, 70 T.C. 312 (1978). Here, too, the construction cost of the mall would be much larger than the $ 3,475,000 purchase money mortgage. If in fact, the purchase price was to be financed through the construction loan, the deferral *436 of payment of the purchase price for a period coinciding with the rescission period would not be persuasive evidence of a sham transaction. Since the right of rescission was also tied to construction, the two periods would necessarily have to be related, although we do not doubt that the precise timing of payment was, in fact, tied to the period within which rescission could be affected. We also believe that the right of rescission served a bona fide business purpose. Petitioner's master land use plan for the Major Center property called for the construction of a shopping mall, and the deed included a provision that the use of the property was restricted to a regional type shopping mall until December 31, 1975. After Florida Mall reconveyed the property to petitioner, petitioner contacted other developers of shopping malls in an effort to have one *437 of them acquire the property. These efforts continued until the entire Major Center tract was sold to the Major Center Limited Partnership. We note, moreover, that DeBartolo was unhappy with the precise terms of the covenant and agreed to them because Edward DeBartolo felt that he could get an extension if needed. The particular method of paying the purchase price over 5 years and the right of rescission appear to us to have been negotiated at arm's length and served the particular needs of both parties. As noted earlier, however, it appears that the precise timing for payment was fixed according to the period of rescission. Thus, we believe this is some evidence, although clearly not dispositive, of a sham. We also agree with petitioner that the fact that property is sold to a corporate purchaser with minimal capitalization [27] *439 *440 does not of itself render the sale nugatory even where only a minimum downpayment is made. Nor would the fact that the purchase price is secured entirely by a nonrecourse mortgage be sufficient to hold a transaction open. [28] But this is not being argued here. What respondent contends is that these facts are evidence that the transaction was a sham; that *438 even though Florida Mall (or DeBartolo) was technically committed to paying the contract price, its failure to do so would not have involved any material economic loss. Cf. Moore v. Commissioner, 214 F.2d 991 (7th Cir. 1941). Here, Florida Mall could simply have "walked away" from the property by refusing to make payments on the mortgage and having the property retaken by Major through foreclosure. In such event, its loss would only be the amount of actual cash previously invested in the project. Thus, in a transaction of this sort the lower the cash investment, the more the transaction takes on the economic substance of an option. In this respect respondent attempts to attack as a "sham" the characterization of the transaction as a completed sale. Florida Mall's investment in the property was no more than the $ 25,000 deposit and $ 9,014.47 in real estate taxes. [29] *442 We agree with respondent that this commitment is so small in relation to the price of the property being transferred that it could be regarded as no more than option money. However, in a transaction of this sort, we are reluctant *441 to recast the structure which the parties have created, without a compelling reason for doing so. This situation is not a "sham" transaction in the classic sense of having no economic substance other than income tax benefits. See Knetsch v. United States, 364 U.S. 361 (1960). The financing of real estate purchases through nonrecourse mortgages is a customary business practice without inherent income tax motivation. Cf. Mayerson v. Commissioner, 47 T.C. 340 (1966). Unless the property is being sold at a loss, which was not the case here, the characterization of an option as a completed sale would ordinarily have adverse tax consequences to the seller. [30] While it is true that a nonrecourse mortgage coupled with a low downpayment creates a situation similar in economic effect to an option, we do not believe that the absence (or nominal amount) of a downpayment is persuasive evidence of a sham transaction. To hold otherwise would lead to unwarranted line-drawing based upon the size of a downpayment in relation to the total cost of the property in any individual transaction. Respondent *443 next maintains that because Florida Mall was under no legal obligation to reconvey, but did so in any event, the deed must be deemed a sham. The general rule under Florida law is the preliminary agreements and understandings relating to the sale of real estate merge into the deed and are extinguished thereby. Milu, Inc. v. Duke, 204 So.2d 31, 33 (Fla. Dist. Ct. App. 1967); St. Clair v. City Bank & Trust Co. of St. Petersburg, 175 So.2d 791, 792 (Fla. Dist. Ct. App. 1965). The warranty deed executed by Major contained no mention of Major's right of rescission upon Florida Mall's failure to meet the covenants in the sales contract. Therefore, argues respondent, the doctrine of merger would operate to extinguish Major's right of rescission. But since both parties considered Florida Mall obligated to reconvey the property to Major in spite of their legal standing under the deed (especially true in light of Florida Mall's desire to retain the property), respondent maintains that the deed was a sham and both parties ignored the form. We agree with petitioner that the doctrine of merger would not apply here. A covenant in a contract that is collateral may survive delivery of the deed. *444 Milu, Inc. v. Duke, supra. The intent of both parties here was that the contract provision was to have effect, and Florida Mall considered itself obligated under the provisions of the contract to reconvey if it failed to comply with the covenants. We note, moreover, the even if the right of rescission was in the deed, the deed would have been effective to convey legal and equitable title (see page 34). Respondent also points out that Florida Mall, when requesting title insurance, advised the title insurance company that the title policy would not be purchased or issued until the purchase price was paid, and that because the commencement of construction had not been definitely determined, no reliable estimate of when the policy would actually be issued could be given. While this does tend to indicate uncertainty on the part of DeBartolo as to whether it would ultimately pay the full purchase price (and therefore require title insurance protection to the full extent thereof), such uncertainty could have been caused by concern over its ability to comply with its development timetable, and does not necessarily indicate that it viewed its position as a mere optionee. Moreover, an interim *445 title insurance binder was requested (for the purpose of providing DeBartolo with a title status report prior to the initial closing date), and on May 21, 1968, the title insurance company issued its interim binder. Two days later, the title insurance company issued its endorsement to the binder and forwarded it to DeBartolo. DeBartolo's apparent concern with the status of the title to the property tend to confirm the seriousness of its intentions with respect to the property. We are troubled by the Supplement to Contract of Sale and Purchase, dated May 23, 1968. Under this supplementary contract, the parties agreed that the transaction would be closed by conveying to Florida Mall the 175-acre tract described in the warranty deed but that Florida Mall could select a different parcel, not less than 175 acres, within 6 months after closing. If this parcel differed from the original parcel selected, the necessary documents would be executed to correctly describe the land. We believe this supplemental contract was integrally related to the transfer of the deed. It seems to us that the warranty deed, although absolute on its face, was never intended to close the deal and that Florida *446 Mall was to have an additional 6 months in which to locate the property upon which to construct the mall. There were at least two obvious benefits to petitioner in closing the deal by May 31, rather than in 6 months: (1) the tax benefit in using up expiring net operating loss carryovers; and (2) the ability to issue $ 2,200,000 in additional notes pursuant to the Note Purchase Agreement. [31]
Respondent also points out that reporting gain from the sale substantially reduced the deficit in petitioner's retained earnings account and thus improved its financial statements (which, by reporting the transaction as a sale, led to the SEC determination that the financial statements were misleading). In this regard, the bid price on petitioner's stock was quoted by securities dealers at $ 2.25 per share on December 22, 1967 while during 1968, the bid price rose to a high of at least $ 14.12 per share. [32] *448 The ability to issue additional notes, of course, provided *447 petitioner with a bona fide business purpose for closing as if May 31. Nor is there anything wrong in petitioner's requiring the closing to be as of May 31 (rather than later) solely in order to use up its loss carryovers. But the fact that petitioner wanted to close as of May 31 for these purposes represents the only reasons in the record for actual delivery of a deed (subject to substitution), despite DeBartolo's indecision concerning the exact 175-acre location rather than simply a deferral of the closing date. [33] *449 There were also advantages to DeBartolo in casting the transaction as an absolute conveyance rather than an option. The deed contained no declaration of a condition subsequent and thus might have facilitated the obtaining of financing: no mention was made of petitioner's right of rescission in DeBartolo's application for the $ 500,000 loan to cover pre-development costs. Thus, it appears that there was not a closed transaction as of May 31, 1968. [34] Nonetheless, we do not agree with respondent's contention that the dealings between petitioner and Florida Mall were sham. We believe that both parties intended that 175 acres be transferred for development of a shopping center, subject to certain contingent rights of reconveyance. Given the bona fides of the parties' business intentions, the transaction itself cannot be held a sham. It is only *450 the purported timing of the transaction (i.e., the attempt to create a closed transaction prior to May 31, 1968) which is suspect. Whether or not the transaction is considered closed prior to May 31, 1968, does not effect the result in the case, as long as a sale is deemed to have been closed at any point prior to the reconveyance, the reconveyance would result in the increased basis which petitioner claimed in the subsequent 1972 sale to the Major Center Limited Partnership. Based upon all the factors discussed above, we believe that a bona fide sale, closed for tax purposes, occurred no later than March 25, 1969, the date at which *451 the formal agreement finalizing the transfer of the original deed was recorded. [35] Petitioner is, therefore, entitled to step up its basis in the land to reflect the gain it previously recognized on the sale. [36]
Issue 2
We now turn to the issue of whether the Major Center property was held "primarily for sale to customers in the ordinary course of [petitioner's] trade or business" within the meaning of section 1221(1) [37][38] or section 1231(b)(1) [39] *453 with the result that gain upon its sale is to be treated as ordinary income rather than capital gain. "Primarily" for these purposes means "of first importance" or "principally," Malat v. Riddell, 383 U.S. 569 (1966). *452 The question is purely factual, to be determined on a case-by-case approach. To aid in deciding this question, courts have given consideration to several factors: (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the *454 property; and (7) the time and effort the taxpayer habitually devoted to the sales. United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); McManus v. Commissioner, 65 T.C. 197, 211 (1975), 583 F.2d 443 (9th Cir. 1978), cert. denied 440 U.S. 959 (1979). Petitioner was incorporated for the stated purpose, among other things, of acquiring, developing, holding, and selling real estate. It initially proposed to engage primarily in the acquisition and sale of large, unimproved tracts of real estate and the development of tracts with others for residential or other purposes. In 1960, its first year of operation, it acquired 87 tracts of unimproved real property in Florida, comprising over 65,000 acres of land of which the 2,500 acre Major Center property was a part. All of petitioner's property was classified as property held for sale through its fiscal year ending May 31, 1967; prior to the end of the following year, petitioner divided its land holdings into two categories, one entitled "Held for Sale" and one entitled "Held for Development." The only property placed in this latter category was the Major Center property. It is, of course, well established that a taxpayer involved *455 in the real estate business may hold real estate as an investment. Rouse v. Commissioner, 39 T.C. 70 (1962); Eline Realty Co. v. Commissioner, 35 T.C. 1 (1960); Mieg v. Commissioner, 32 T.C. 1314 (1959); Crabtree v. Commissioner, 20 T.C. 841 (1953). The fact that petitioner initially acquired the Major Center property as property held for sale in the ordinary course of its real estate business is relevant only insofar as it provides evidence to determine the purpose at the time of sale. [40] *456 The purpose for which a particular asset is held may change from time to time and it is the purpose for which the property is held at the time of sale that determines its tax treatment. Biedermann v. Commissioner, 68 T.C. 1 (1977); Maddux Construction C. v. Commissioner, 54 T.C. 1278 (1970). Respondent also correctly points out that a real estate business bears a heavy burden in attempting to separate for special treatment a small fragment of a tract brought for development and sale. Slappey Drive Ind. Park v. United States, 561 F.2d 572 (5th Cir. 1977). We agree with petitioner that the Major Center tract should be treated differently than its other properties. We note, initially, that unlike the situation in Slappey Drive Ind. Park v. Commissioner , supra, we are not dealing with a fragment of a larger tract bought for sale. Rather, the tract in this case was never part of another, larger tract although we agree that the evidence supports respondent's position that the Major Center property was originally purchased for sale to customers. We note, moreover, that no part of the property was sold for over 7 years. In 1967, Major hired Raidle as its new president. His initial objectives were to dispose of properties other than the Major Center property and to prepare a master land use plan for its development. At this time, consistent with this intent, Major divided its land holdings on its books into two categories, separating the Major Center property *457 from its other properties. On this basis, we believe that the Major Center property was treated specially by petitioner, keeping in mind, nonetheless, that petitioner was primarily engaged in the purchase, development, and sale of real estate. We must now answer the more difficult question of whether petitioner held the property for sale in the ordinary course of its business. Ideally, petitioner desired to be able to develop the property itself or remain as a joint venturer in the development of any of the property it sold, or possibly lease the property. In fact, petitioner entered into several joint ventures, and developed, either by itself or through wholly-owned subsidiaries, various projects within the Major Center property. Nonetheless, where it would be more beneficial to sell rather than develop the property itself, petitioner was not hesitant in doing so. Prior to the sale in April 1972 to Major Center Limited of the entire tract for close to $ 37,000,000, petitioner had made sales totaling a little over $ 2,800,000 in fiscal 1971 and approximately $ 4,564,000 in fiscal 1972; thus, prior to the April 1972 sale, petitioner had sold approximately 16-1/2 percent of the *458 total value of the property (not including the 175 acres to DeBartolo). Options had been granted on an additional 9 acres. Also, petitioner had been attempting to sell the 175 acres reconveyed by DeBartolo to other developers of malls. We do not believe this is an insignificant amount, especially since it is clear that additional parcels of land would be sold by the partnership. [41] Petitioner also spent over $ 1,500,000 in development costs for platting four subdivisions covering 415 acres. Moreover, references in the shareholders reports are to the effect that Major planned on selling or developing the property. In fact, it appears that petitioner would have had to sell some of the land in order to continue developing other sections of the tract; the 2,500 acres was much too large for petitioner to develop itself. The sale to the partnership thereby enabled the Major Center property to be developed *459 or sold more rapidly because of the additional capital GOREDCO could supply. It relieved petitioner of a substantial financial and managerial commitment, and enhanced its financial position. Thus, the sale facilitated efforts to acquire new properties for development and sale, and during its fiscal year ending May 21, 1972, petitioner purchased a 5,800-acre tract for $ 5,800,000 and a 640-acre tract of industrial property for $ 4,000,000. On these facts, we hold that petitioner has failed to meet his burden of proof, and that the property was held primarily for sale in the ordinary course of petitioner's business. Decision will be entered under Rule 155. Footnotes
1. On December 19, 1967, Raidle sold Edward DeBartolo, President of DeBartolo, 25,000 shares of Major stock for $ 62,500, requiring 10 percent down and the balance of $ 56,250 plus interest due on or before December 19, 1970. The balance of the purchase price, as represented by a promissory note dated December 19, 1967, was paid by Edward DeBartolo in accordance with the terms of the note. Major's stock was bid at $ 2.25 per share on December 22, 1967, the closest trading date to the date of the sale. There were no asked prices listed for December 19. During 1968, the average daily bid price of Major's stock rose to a high of $ 14.12 per share. 2. In a letter dated October 30, 1967, Edward DeBartolo wrote to A. A. Savill of the American Fletcher National Bank & Trust Co., who was also a member of Major's board of directors, in which he set forth a proposal to be submitted to Major for the purchase of approximately 100-120 acres of land: Price is $ 15,000 per acre. Purchase would be interest free for the first two years, interest at six (6%) percent to begin at third year. Purchase price would be fully subordinated to permanent or construction financing. Land to be paid off during the third, fourth and fifth years to be agreed upon by both parties. Our alternate proposal would be that we would lease the same amount of land at $ 1,200 per acre or give Major Realty the option to take 5 1/2 % of our gross rents, excluding Mall and Common Area Maintenance and Merchants Association charges and any and all other charges for utilities. Term of lease would be thirty-five (35) years with six 10 year renewals. Of the two deals, we would prefer the lease proposal. The land area to be purchased or leased is to be the one that we suggested for the center at our visit in Orlando or as a second choice the site that they had laid out for the center.↩
3. The warranty deed executed by Major contained no mention of a right of rescission by Major upon the failure of Florida Mall to abide by the terms of paragraph 3.B. and 7 of the sales contract. Regardless of whether the rights and obligations set forth in these paragraphs survived the closing of the transaction, however, and regardless of whether there was any legal obligation to reconvey the property if Florida Mall failed to comply with the covenants set forth in paragraph 3.B., Florida Mall considered itself obligated under the provisions of the contract to reconvey the property to Major if it failed to comply with the covenants. The deed also included a provision that the use of the property was restricted to a regional type shopping mall until December 31, 1975. ↩
4. The total purchase price was $ 3,500,000 computed on 175 acres at $ 20,000 per acre. As noted earlier, $ 25,000 was previously deposited by DeBartolo as earnest money.↩
5. The legal description of the land conveyed in both the warranty deed and Supplement to Contract was as follows: being the easterly 175 acres of that part of Sections 13 and 24, Township 23 South, Range 28 East, Orange County, Florida, lying south of Orlando-Vineland Road; lying west of Florida State Road No. 435 (also known as Kirkman Road); and lying north of the right of way of The Florida Gas Transmission Company in said Section 24; the westerly boundary of said tract being parallel to the cast line of Section 13, aforementioned. But the Supplement to Contract contained the following, additional language not in the warranty deed: Notwithstanding the acceptance of the conveyance by the description set forth above, it is mutually agreed that in accordance with said agreement, the easterly line of said parcel shall be the west right of way line of Kirkman Road; the northerly bouindary line of said parcel shall be the south right of way line of Orlando-Vineland Road; and the west boundary line shall be parallel to Kirkman and shall contain 175 acres. ↩
6. The original contract called for a closing date not later than May 31, 1968 unless there were any defects in title. The Supplement to Contract (although dated May 23, 1968) stated that the "Buyer wishes to cooperate with Seller's financing to close * * * on or about May 22, 1968."↩
7. This amendment was first proposed by Florida Mall on May 21, 1968.↩
8. As of November 1969, Major had been negotiating with other potential buyers of the 175 acres at much higher prices. Major also wanted to participate in development of the shopping center.↩
9. As of May 31, 1967, Major had a deficit of $ 6,880,308 in its retained earnings account; Major reported net income of $ 3,116,350 on its fiscal year ending May 31, 1968, thereby reducing its deficit in its retained earnings account as of that date to $ 3,763,958. Additionally, Major (and its subsidiaries) had net operating losses of $ 283,835 in 1964, $ 1,167,640 in 1965, $ 1,341,269 in 1966, and $ 2,618,148 in 1967. It had taxable income in its fiscal year ending May 31, 1968 (before a net operating loss deduction) of $ 1,004,881.↩
10. Raidle, in his address to Major's stockholders on April 20, 1972, stated, in part: The difference between the timing is that they [GOREDCO] have the monies available to do things, to hold property, and the residual which will be kept in the partnership, the apartments, the commercial buildings, the shopping centers, are such that we will have an on-going income, where previously we were not in a position as Major to do that.↩
11. Property in the "Held for Sale" category was valued as of May 31, 1968 at cost, at $ 3,230,409.61; the Major Center property was valued, at cost, at $ 4,974,485,52 (excluding the 175 acres sold to Florida Mall).
12. Sales for FYE 5-31-71 (All within Major Center Project) Site
Amount
Valle Steak House
$ 250,000.00
Howard Johnson Motel
758,000.00
Sheraton Motel
1,087,296.80
Glen Turner Location
688,936.00
Lot Sales
11,350,00
Land Sale
7,519.20
$ 2,803,102.00
Sales for FYE 5-31-72 (All within Major Center Project) ↩
Site
Amount
Standard Oil Company
$ 200,000.00
Department of Transportation
28,250.00
Meleen Hotel Corp.
(Court of Flags)
489,465.00
Rodeway Inn
541,715.07
Court of Flags #2 & #3
831,243.00
Davis Bros. Motel
150,000.00
Meleen Hotel Corp.
(Court of Flags)
443,835.00
Standard Oil
150,000.00
Carlton House
513,435.00
Goodwin & Cohn (motel)
375,000.00
Condominiums
833,717.53
Lot Sales
8,000.00
$ 4,564,660.60
13. Petitioner does not contend that the sales contract of March 31, 1968, was other than an executory contract for the purchase of real estate and it is clear that such an executory contract is insufficient to constitute a completed sale. Lucas v. North Texas Lumber Co., 281 U.S. 11 (1930); Chapin v. Commissioner, 180 F.2d 140 (8th Cir. 1950), affg. 12 T.C. 235 (1949); Commissioner v. Union Pacific Railroad Company, 86 F.2d 637 (2nd Cir. 1936); Commissioner v. North Jersey Title Insurance Co., 79 F.2d 492 (3rd Cir. 1935); Merrill v. Commissioner, 40 T.C. 66 (1963), affd. 336 F.2d 771 (9th Cir. 1964); Alderson v. Commissioner, 38 T.C. 215, 221 (1962); Consolidated Gas & Equipment Co. of America v. Commissioner, 35 T.C. 675 (1961); Ennis v. Commissioner, 17 T.C. 465 (1951); Gilken Corp. v. Commissioner, 10 T.C. 445 (1948), affd. 176 F.2d 141 (6th Cir. 1949); Number Nine Plantation v. Commissioner, 23 B.T.A. 974 (1931); Bourne v. Commissioner, 23 B.T.A. 1288 (1931), affd. 62 F.2d 648 (4th Cir. 1933), cert. denied 290 U.S. 650↩ (1933). 14. Respondent refers to Raidle's address to stockholders on November 25, 1969 in which reference was made to the transaction as "on an option sale basis." In the context of the entire speech, however, this statement is of little probative weight. ↩
15. In this respect, both respondent and petitioner on brief allude to the doctrine of equitable conversion, whereby equitable title passes to the purchaser at the time a contract is signed (so that any loss or damage to the property defalls the purchaser). This doctrine applies in Florida. Estate of Sweet v. First National Bank of Clearwater, 254 So.2d 562, 563 (Fla. Dist. Ct. App. 1971). It is clear that a contract to sell real estate which operates to invoke the doctrine (which respondent argues does not apply here because the contract and supplemental contract do not adequately describe the land to be conveyed) is insufficient of itself to effectuate a completed transaction for tax purposes since the transfer of title and full payment were conditions to the completion of the transaction. Lucas v. North Texas Lumber Co., 281 U.S. 11 (1930). Moreover, under the specific terms of the original contract of March 31, 1968, the obligation to purchase was specifically subject to perfection of title, and though the supplemental contract of May 23, 1968, did not specifically state this, it is clear that a purchaser is entitled to marketable title even if not stated in the contract. Taylor v. Day, 102 Fla. 1006, 136 So. 701 (1931). The inability of Major to deliver a marketable title on the closing date would have released the purchaser from its obligations under the agreement and would have entitled it to a refund of its downpayment. This is sufficient to render the contract executory. 2 Lexington Avenue Corp. v. Commissioner, 26 T.C. 816 (1956); Gilken Corp. v. Commissioner, 10 T.C. 445 (1948), affd. 176 F.2d 141 (6th Cir. 1949); Wurtsbaugh v. Commissioner, 8 T.C. 183 (1947). (This is not to imply that formal approval of title is necessary to close a transaction. In Frost Lumber Industries, Inc. v. Commissioner, 128 F.2d 693 (5th Cir. 1942)the vendor executed and recorded a deed, subject to return of the purchase price in the event that a formal title search should prove the title defective. After the deed was filed, no conditions precedent were required to be performed before the obligation to pay became fixed.) See also Helvering v. Nibley-Mimnaugh Lumber Co., 70 F.2d 843 (D.C. Cir. 1934). Cf. also Consolidated Gas & Equipment Co. of America v. Commissioner, 35 T.C. 675 (1961). Nor is it necessary that a seller deliver a deed to close a transaction since delivery of the deed may be postponed, for example, in order to provide security for the purchase price. See Commissioner v. Baertschi, 412 F.2d 494 (6th Cir. 1969), reversing 49 T.C. 289 (1967); Wiseman v. Scruggs, 281 F.2d 900 (10th Cir. 1960); Commissioner v. Union Pacific Railroad Co., 86 F.2d 637 (2nd Cir. 1936); Pomeroy v. Commissioner, 54 T.C. 1716 (1970); Merrill v. Commissioner, 40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). See also Standard Lumber Co. v. Commissioner, 28 B.T.A. 352 (1933). (Sale is complete under Florida law when the consideration was received, and the benefits and burdens of ownership were transferred when purchaser went into possession; fact that deed was not transferred was not dispositive.) As to respondent's contention that equitable conversion is inapplicable, we note that equitable conversion applies to a contract for sale only when a court will compel the seller to specifically perform the contract. If the contract does not sufficiently describe the land, specific performance will not lie. We do not deal with the issue of whether either of the contracts are sufficient to support an action for specific performance since such a determination is not relevant here. But see 46 ALR2d 894 (1956); cf. Sessions v. Olds, 157 Fla. 58, 24 So.2d 803↩ (1946).
16. Whether the transaction here is a completed sale for tax purposes must be measured by a Federal standard rather than on the characterization of the contract under state law. Cf. Lyeth v. Hoey, 305 U.S. 188, 194 (1938). Nonetheless, the legal rights created (as opposed to how those legal rights are to be interpreted) and the disposition of the property which was made under the contracts and deed must be determined under state law. Fletcher v. United States, 436 F.2d 413 (7th Cir. 1971); Commissioner v. Stuart, 300 F.2d 872 (3rd Cir. 1962); Holcomb v. Commissioner, 68 T.C. 786↩ (1977). 17. Based upon this contention, respondent maintains that it was not until December 13, at the earliest, when Florida Mall decided to proceed on the basis of the original 175 acres, that the ambiguity was removed.↩
18. We do not believe these cases are distinguishable on the grounds that the documents in these cases were executed on the same day while the supplemental contract in this case was executed on the day following the execution of the deed, as petitioner contends. The supplemental contract was part of the same transaction and integrally related to the deed; it was only one day later that it was entered into, and we believe this suffices for purposes of Florida law. Moreover, if the supplemental contract is not considered part of the same transaction, there would not appear to be any consideration for Major's promise to convey a different 175 acres. Both parties appear to have considered Major obligated under this contract.↩
19. Respondent does not contend that reading to two documents together would show that the parties contemplated a subsequent deed, and that the two documents together would be considered under Florida law to be an executory contract for the purchase of not less than 175 acres to be determined later, rather than as an absolute coveyance. Nor does respondent contend that this supplemental contract converted the deed into an option, or a deed with an option to reconvey. Accordingly, we do not address this issue, although we do not, in any event, believe that respondent could show by clear, strong, and convincing evidence that the parties intended other than an absolute conveyance. We note, however, that where an agreement allegedly conveying titlt itself is ambiguous as to whether title was actually conveyed and it appears from the instrument that the parties contemplated a subsequent deed of conveyance, it is generally held under Florida law that the contract construed will be viewed as executory and not as a deed. First Mortgage Corp. of Stuart v. deGive, 177 So.2d 741 (Fla. Dist. Ct. App. 1965). Respondent does contend, though, that at the time the deed was transferred, DeBartolo and petitioner had not reached a final agreement as to the specific land to be conveyed and the deed was, therefore, a sham.↩
20. See also Babin v. Commissioner, T.C. Memo. 1962-177, relied upon by respondent. The taxpayer-seller and a purchaser entered into a written "Offer to Purchase" a one-half interest in a 120-acre subdivision. Some of the land was then conveyed by deed to a corporation owned equally by the purchaser and taxpayer. Notwithstanding this written offer the parties had an oral understanding that if the 120 acres could not be sold, the taxpayer would return to the purchaser all of the payments advanced by the purchaser and the "purchaser" would return the property to the taxpayer. Most of the land could not be sold and the purchaser deeded back to the taxpayer his one-half interest in the land not conveyed to the corporation, and the taxpayer returned the purchaser's consideration paid. We held that while the taxpayers and purchasers went through the form of making a sale and organizing a corporation, since there was an understanding that if the property could not be sold the parties would be restored to their original position, no sale ever occurred. Babin is distinguishable in that in Babin, there was an agreement by both parties to be restored to their original position while in the case at bar, only the seller had the right to restore the parties to their original positions. Of course, it is respondent's contention that the parties here intended their agreement, in substance, to achieve the same result as in Babin↩.
21. Petitioner argues that any evidence relating to its offer of settlement, stipulation, statement of findings, opinion and order of the SEC cannot be considered by this Court under Rule 408 of the Federal Rules of Evidence.Respondent counters that we may consider this evidence solely for the purpose of showing the rationale of the SEC in its finding that the transaction lacked substance for accounting purposes. Both parties realize, of course, that accounting principles are not determinative for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561↩ (1978). Even if we were to rely on the SEC opinion in this case for the narrow purposes for which respondent contends, it would not change our ultimate holding on this issue. Accordingly, we do not decide whether we may consider this as evidence.
22. Neither party makes reference to the purchaser's right under paragraphs 3.A. and 7 to rescind the contract within 120 days after closing if the property was not zoned to permit its use as a retail shopping center. The record is silent on the rezoning but we infer that the convenant was met by closing. We do not address the issue of whether this convenant would be sufficient to hold the transaction open for tax purposes for 120 days after closing.
23. In Genet v. Florida East Coast Railway Co., 150 So.2d 272 (Fla. Dist. Ct. App. 1963), the following provision, similar to that in the present contract, was inserted in the deed of conveyance: As a part of the consideration for this deed it is mutually agreed between the parties that the land hereby conveyed will be used for the construction of a warehouse and business facilities for grantees own use and for no other purpose. In the event said property is not developed for such use within two years from the date of this deed, said property shall become at the option of grantor, re-sold to the grantor for the original purchase price, plus the amount of all advalorem taxes paid by grantee on said property. The purchaser had argued that the right in the grantor was invalid and unenforceable but the court held that it created a valid condition subsequent. ↩
24. Cf. also section 1.1038-1(a)(2)(i), Income Tax Regs. See also Frissell v. Nichols, 94 Fla. 403, 114 So. 431 (Fla. 1927); Genet v. Florida East Coast Railway Co., 150 So.2d 272 (Fla. Dist. Ct. App. 1963). Transfer of possession to the holder of an option would not be sufficient, without more, to close a transaction. Clinton Park Development Co. v. Commissioner, 209 F.2d 951↩ (5th Cir. 1954).
25. Petitioner on brief argues that a common procedure in Florida construction projects is that when construction financing is obtained, the purchase money mortgage on the land has to be paid in full; that construction lenders insist upon having a first mortgage when making a construction loan and this is not possible until the purchase money mortgage is paid, unless the mortgagee consents to the subordination of its lien to the construction lenders' security interest; and, that even in the case of subordination to a construction loan, the purchase price owing to the seller of the land would be paid when permanent financing could be obtained. While petitioner so argues on brief, the record is silent on normal financing procedures in Florida construction projects.
26. In the letter of October 30, 1967, Edward DeBartolo proposed terms to purchase the land. One alternative (not the most favored) was for the purchase price to be fully subordinated to permanent or construction financing and be paid off during the third, fourth and fifth years; interest would begin at 6 percent during the third year.↩
27. Petitioner relies on Commissioner v. Brown, 380 U.S. 563 (1965). There the taxpayers transferred their stock in a corporate enterprise, along with two promissory notes totaling $ 125,000, to a tax-exempt organization in consideration for a noninterest-bearing note in the amount of $ 1,300,000. The organization was obligated to pay 90 percent of the income it received from a lease of the corporate assets in payment on the note but was not otherwise bound to make payment. The organization liquidated the corporation, sold its current assets subject to liabilities (other than the $ 125,000 of notes), and leased the fixed assets for a period of 5 years to a new corporation, which had been set up by a third party separate from petitioners. This new corporation was obligated to pay rent equal to 80 percent of its net profits before taxes and depreciation. At the termination of the 5-year lease the corporate assets were returned to the tax-exempt organization which entered into an amended agreement with petitioners permitting it to negotiate a sale thereof even though the $ 1,300,000 note was not paid in full. The assets were subsequently sold by the tax-exempt organization, thus terminating the transaction between it and the taxpayers. The Court held that the transfer of the taxpayers' stock to the tax-exempt organization constituted a sale within the meaning of section 1222(3) entitling the taxpayers to capital gains treatment. The Commissioner did not argue in the Supreme Court that the transaction was a sham, but rather that since the tax-exempt organization invested nothing, assumed no independent liability for the purchase price and promised only to pay over a percentage of the earnings of the company, the entire risk of the transaction remained on the sellers. The Court held that for purposes of a "sale" (within the meaning of section 1222(3)), it is not necessary that the buyer undertake to pay the purchase price from sources other than the earnings of the assets sold or make a substantial downpayment. There was no dispute there by the Commissioner that the transfer was not complete and did not constitute a taxable disposition. This case, therefore, is distinguishable from the case at bar. 28. Whether or not the mortgage instrument was specifically made "nonrecourse," the nominal capitalization of Florida Mall, the mortgagor, effectively leaves the mortgagee, Major, without recourse against any significant assets in the event of default.↩
29. Petitioner contends that its cash commitment to the property also included pre-development expenditures totaling $ 72,344, plus interest of $ 8,458.33 on a loan taken out to finance pre-development costs. However, we agree with respondent's contention that these expenditures might have been made even if the transaction were intended as an option. In evaluating whether the transferee regards his true position as optionee or owner, the cash paid to the transferor would seem to be the most relevant measure of the permanence of the commitment to the property. 30. In the instant case, it appears that respondent's principal concern is with the tax savings achieved by Major through what respondent considers artifical generation of income in order to effectively preserve the benefits of a net operating loss carry-forward which otherwise would have expired unutilized in the tax year in question. While such circumstances do warrant close scrutiny of the transaction, we do not think that recasting of the transaction is appropriate absent a showing that the parties never in fact intended an ultimate transfer of ownership to Florida Mall and that DeBartolo and Florida Mall were merely used as accommodation straw parties. The record falls far short of indicating this type of "sham" dealing.↩
31. Respondent notes that the Supplement to Contract states that the purpose for closing on May 22 was to facilitate petitioner's financing. However, since the original contract called for a closing date of May 31, this is not significant.↩
32. Respondent argues that Edward DeBartolo received a personal benefit in improving petitioner's balance sheet becaue he was a stockholder, having purchased 25,000 shares of stock in December 1967 from Raidle for $ 2.50 a share. Petitioner contends that any evidence relating to the purchase by Edward DeBartolo is inadmissible, irrelevant and immaterial because of the following facts: the sale of stock took place almost 3 and 1/2 months prior to the execution of the sales contract; the sale of stock was between individuals, not between the corporate parties to the transaction; the purchase price for the stock was in excess of its fair market value; and, Edward DeBartolo was holding the stock for investment. We believe such evidence is admissible. Edward DeBartolo appears to be the controlling force behind DeBartolo and we cannot, as a matter of law, entirely divorce his motives from that of the corporation where respondent is arguing a sham or that the parties were not negotiating at arm's length. It would always be open for respondent to show that the controlling shareholder of a corporation had the corporation enter certain transactions for his benefit. Nonetheless, we do not believe that respondent's argument is entitled to much weight here. In this case, we do not see any evidence that Edward DeBartolo was using DeBartolo to promote his own interests, aside from any inferences which may be drawn from his purchase of stock. It also appears that Edward DeBartolo was holding his stock in petitioner as an investment, rather than for quick resale and that he always hoped to complete the mall. Thus, in this context, the reporting of the Florida Mall sale by petitioner in 1968 would not have been of great significance. 33. Cf. Ripley Realty Co. v. Commissioner, 23 B.T.A. 1247 (1931), affd. 61 F.2d 1038 (2nd Cir. 1932) (where a taxpayer sold property in 1926, the profit from the sale must be computed without regard to an agreement made in a later year by which the taxpayer took back some of the property). See also Hope v. Commissioner, 55 T.C. 1020 (1971), affd. 471 F.2d 738 (3rd Cir. 1973), cert. denied 414 U.S. 824 (1973). But cf. Guffey v. Commissioner, 339 F.2d 759↩ (9th Cir. 1964).
34. We do not hold, as a matter of law, that a transaction similar to the one here (i.e., a real estate contract which provides the purchaser with the right to exchange that particular parcel of land for which he receives the deed under the contract for another parcel within a certain time period if the property transferred is found unsatisfactory) cannot be a closed transaction. Rather we state only that the record here supports respondent's inference, as a factual matter, that the parties intended that the transaction was not closed. See footnote 17.↩
35. We express no opinion on whether the mere decision on December 13, 1968 by Florida Mall to proceed on the basis of the originally contemplated 175 acres suffices to close the transaction at that point. Such a finding is not relevant here since the transaction in any event is closed during Major's fiscal year ending May 31, 1969. ↩
36. To be sure, such gain may have been reported in an earlier year than it should have been, but this does not alter our result with respect to the computation of the gain on the resale in 1972.↩
37. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
38. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. ↩
39. Sec/. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (b) Definition of Property Used in the Trade or Business.--For purposes of this section-- (1) General Rule.--The term "property used in the trade or business" means property used in the trade or business, or a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months [9 months for taxable years beginning in 1977; 1 year for taxable years beginning after December 31, 1977], and real property used in the trade or business, held for more than 6 months [9 months for taxable years beginning in 1977; 1 year for taxable years beginning after December 31, 1977], which is not-- (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by a taxpayer described in paragraph (3) of section 1221.↩
40. The Fifth Circuit, to which appeal in this case would lie, noted in Slappey Drive Ind. Park v. United States, 561 F.2d 572 (5th Cir. 1977), at footnote 31, that prior ordinary sales intent is relevant in deciding whether the lots in issue should be viewed in isolation from the taxpayer's other, overall tracts. See also Biedenharn Realty Co. v. United States, 526 F.2d 409 (5th Cir. 1976), cert. denied 429 U.S. 819↩ (1976).
41. We believe evidence of the partnership's intent with respect to the land plan is relevant here since petitioner retained a half-interest in the property and the partnership was to conform to petitioner's original plan, although the sale or development of the property would be much faster.↩